Filed 5/6/14; pub. order 5/22/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

In re J.C., a Person Coming Under the
Juvenile Court Law.

ORANGE COUNTY SOCIAL SERVICES
AGENCY,

    Plaintiff and Respondent,

      v.

M.C.,

    Defendant and Appellant.

G049095

(Super. Ct. No. DP021151)

O P I N I O N

Appeal from orders of the Superior Court of Orange County, Jacki C. Brown, Judge. Affirmed.

Boxer McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\* \* \*

J.C.'s mother M.C. (Mother) appeals from the termination of her parental rights.[1]  On appeal, she maintains the court erred in denying her Welfare and Institutions Code section 388 modification petition (hereafter 388 petition)[2] and should have applied the "parental benefit exception" to adoption.  (§ 366.26, subd. (c)(1)(B)(i).)  We conclude both contentions lack merit and we affirm the orders.

I

*A.  Detention*

On April 25, 2011, Orange County Social Services Agency (SSA) placed a hospital hold on J.C. following her birth based on allegations of general neglect.  Several months earlier, in February 2011, Mother's three other children were declared dependent children of the juvenile court pursuant to section 300, subdivision (b).  The juvenile court detained J.C. based on evidence Mother had made inadequate progress in her open family reunification case plan with respect to J.C.'s siblings.  Mother's substance abuse was unresolved, she inconsistently drug tested, she received sporadic prenatal care, and she did not have provisions to care for her newborn.

In its detention report, SSA provided information about several prior child abuse referrals.  The first child abuse referral dated back to March 2007 for general neglect due to Mother's drug addiction.  The allegations were deemed "unfounded" after further investigation.  However, the second child abuse referral, dated October 2008 for general neglect, was substantiated.  Mother had missed numerous medical appointments

---

[1]        J.C.'s father R.M. (Father) is not a party to this appeal.

[2]        All further statutory references are to the Welfare and Institutions Code.

2

and echocardiograms scheduled for her then two-year-old daughter, G.C., who was born with a hole in her heart (a condition called Patent Ductus Arteriosus). Mother received family maintenance collaborative services from October 22, 2008 to April 22, 2009, when services ended because Mother moved to San Bernardino County.

There was a third child abuse referral, dated April 1, 2009, alleging general neglect due to Mother's drug addiction and a dirty home. The allegations were deemed unfounded. A child abuse referral in San Bernardino County, dated June 6, 2010, was deemed inconclusive after the social worker was unable to locate the family to investigate the allegations of child abuse and Mother's drug use.

However, on August 18, 2010, a child abuse referral alleging general neglect was substantiated. This referral resulted in then two-year old A.C. and seven-year-old M.C. being taken into protective custody. The petition in the siblings' case alleged Mother left M.C. and A.C. without provisions, emergency contact information, medical information, or information about when she would return. The children's maternal aunt stated Mother dropped off M.C. and A.C. at the apartment she shares with maternal grandmother. Mother told maternal aunt she was homeless and unable to care for the children. Maternal aunt told the social worker she and maternal grandmother were also unable to care for the children and Mother has used methamphetamine for several years.

The petition as to J.C.'s siblings also discussed Mother's history of substance abuse and alleged she had been arrested on February 18, 2008, for possessing a controlled substance and paraphernalia. The petition also mentioned the June 6, 2010, child abuse referral, alleging Mother was living with her children in an unsafe environment; the home had trash, broken windows, and no running water. The petition alleged Father had an unresolved substance abuse problem.

3

The social worker reported Mother had a brief criminal history that included drug-related offenses. Father had an extensive criminal record that included robberies, burglaries, carjacking, and multiple drug-related offenses.

The petition regarding J.C. contained allegations of general neglect based on Mother's lack of adequate progress in her open family reunification case plan concerning her other children. Although she had participated in counseling and parenting classes, she had yet to address her methamphetamine addiction. She had missed many drug tests. She had no tests in January, two tests in February, and one test in March. Mother refused to take any responsibility for why the siblings had been taken into protective custody and instead blamed the maternal grandmother's lack of English skills. The petition alleged Mother did not have any provisions to care for J.C.

On April 28, 2011, the juvenile court ordered J.C. detained and gave Mother daily monitored three hour visits. J.C. was placed with her maternal aunt, Jessica. On June 20, 2011, Mother and Father pled no contest to, and the juvenile court sustained, an amended jurisdictional petition detailing Mother's unresolved drug abuse issues, failure to obtain regular prenatal care, and the siblings' open dependency case. The court declared J.C. a dependent and granted both parents reunification services. The six-month review hearing was set for December 6, 2011.

B. *J.C.'s First Six Months*

During this review period, Mother made minimal progress in addressing her drug addiction. After spending approximately one month in a residential drug program (Heritage House North), Mother admitted leaving the program and returned to using drugs from May 10 to June 13, 2011. She stayed with her friend, Vanessa. Mother then enrolled in and completed Casa Elena's residential 90-day drug rehabilitation treatment program. Upon completion of this program, she again relapsed for over a month (September 10 to October 26, 2011), and in October she returned to the Heritage House North.

4

During this period of turmoil, Mother had sporadic monitored visits with J.C. In May, she had five visits, each lasting for three hours. In early June, Mother had three visits, each lasting three hours, and after she entered Casa Elena she could not leave the program for visits. Jessica brought J.C. to Mother once a week for two hours on Sundays in July, August, and September 2011. The caretaker reported Mother acted appropriately with the baby and was attentive to J.C.'s basic needs. After leaving Casa Elena on September 10, Mother could have visits three times a week for three hours. However, Mother only visited J.C. twice in October during her drug relapse. After Mother entered Heritage House North, visits resumed to once a week for two hours.

The social worker recommended in her report filed December 6, 2011, that the court terminate reunification services and schedule a permanency hearing (hereafter .26 hearing). The social worker opined Mother loved J.C. but she did "not appear to be motivated, or willing, to care for a child, of a tender age of [six] months. When [Mother] was not in a residential drug treatment program, she demonstrated very little initiative in her willingness to want to bond with the child, as her visits with the child were minimal to none. More so, the undersigned recognizes [Mother] has had a long pattern of leaving her children with others. The undersigned does not anticipate that this pattern will change."

On December 6, 2011, the juvenile court (Commissioner Jane Shade) accepted the parties' stipulation to continue the six-month review hearing to January 11, 2012. Mother's monitored visits were increased to three times per week, each lasting three hours. SSA reported Mother's visits were consistent and "going really well."

On the day of the January 11, 2012 hearing, the social worker filed an addendum report changing her recommendation to continue reunification services. Mother had been sober for 45 days while staying at Heritage House North. She was participating in narcotics anonymous (NA) meetings, counseling, and focus groups. Mother spent New Year's Day with all four of her children and Mother reported her

relationship with other family members had improved. Mother stated she was committed to having her children returned to her care and realized she could no longer be in a relationship with Father. The social worker explained she changed her recommendation and liberalized visits to unmonitored status because of the following: (1) Mother's renewed efforts at addressing her drug addiction; (2) all the professionals spoke highly of Mother's progress in the program; and (3) Mother's visits with all the children had been very good.

On January 11, 2012, the juvenile court continued reunification services and scheduled a 12-month review hearing for June 6, 2012. As we will explain, this hearing was continued multiple times and did not conclude until nearly a year later on April 4, 2013.

C. *12-Month Review Hearing Continued for 12 Months (2012-2013)*

By the end of this review period, J.C. was 20 days shy of her second birthday. During this lengthy review period, SSA filed a total of 11 reports, each containing the same recommendation that the court terminate reunification services and schedule a .26 hearing. Over this year-long period, J.C. continued to thrive and become more strongly bonded to her primary caregiver, Jessica, who was her maternal aunt. Despite SSA's recommendations and the undisputed evidence of a stable and loving parental bond with Jessica, Commissioner Shade continued the 12-month review hearing four times before the case was transferred to Judge Jacki C. Brown in October 2012. Judge Brown continued the case an additional six months from October 2012 to April 4, 2013. At the 12-month review hearing, held during the 24th month of these dependency proceedings, the court terminated Mother's services but continued funding for services and authorized overnight visits. The court indicated to Mother there was still a chance she would regain custody. This proved to be untrue.

Below is a brief summary of only the facts relevant to the issues presented by Mother's 388 petition and parental benefit exception argument. Mother did not do

6

well with her case plan for the first two months of this review period. On February 15, 2011, Mother was discharged from Heritage House North for petty theft. The social worker learned mother was on a walking pass with another resident and they went to a store. The resident was arrested for shoplifting and Heritage House North's staff members determined Mother stole toothpaste from the store and "was not truthful." After learning of this incident, the social worker informed Mother her visits with J.C. would now be supervised. This meant Mother had enjoyed only one month of unmonitored visits during the entire first year of the dependency proceedings.

For a few weeks in February 2012 Mother resided with her friend Vanessa. On February 22, 2012, Jessica reported Mother had been drinking and she was concerned about Mother's coping skills. Jessica stated Mother left her visit with J.C. early to visit a sick cousin in the hospital. Several hours later at the hospital, Jessica noticed Mother smelled like alcohol and Mother admitted she "drank one" with Father. The social worker reduced supervised visitation to once a week.

On March 5, 2012, Mother enrolled in the Foley House six-month residential treatment program. She tested positive for methamphetamines upon intake to the program. Mother admitted she was with Father during the prior weekend. Because Foley House could not support Mother's family reunification efforts, she left the program on March 16, 2012, and on April 6, 2012, she enrolled in the Woodglen Recovery Junction (Woodglen) residential drug program. This turned out to be an excellent decision and marks the point in time where Mother began to turn her life around for the better. The same month, on April 23, 2012, J.C. celebrated her first birthday.

After successfully completing the Woodglen program on September 17, 2012, Mother moved to Collette's Children's Home Transitional Living Program for single women (Collette's Home). She found full-time employment, began saving for a down payment for her own residence, and took multiple parenting classes. She had clean

drug tests, attended NA meetings, and developed a support system from staff and friends at the Woodglen program.

SSA's addendum reports all continued to recommended termination of reunification services and for the court to schedule a .26 hearing. SSA's first report prepared for the 12-month review hearing in June 2012 discussed Mother's multiple relapses and concluded her compliance with the case plan requirements to be moderate and inconsistent. The social worker reported that after the shoplifting incident Mother had monitored visits three times per week for three hours. This was reduced on February 22, 2012, after Jessica discovered Mother had been drinking. Thereafter, Mother was permitted supervised visits one time per week for three hours.

The social worker opined Mother loved J.C. but showed "very little initiative in her willingness to want to bond" with J.C. The social worker stated Mother had a long historical pattern of leaving her children with other people. She stated, "The undersigned believes [Mother] is content in knowing that the child is being well cared for by the maternal aunt, Jessica . . . and has never voiced that she is opposed to this arrangement as a permanent plan. [Mother] acknowledges that she recognizes that the child is bonded to [Jessica]."

In later reports, SSA reported Mother was making great progress with her drug rehabilitation efforts and had found full-time employment. The social workers also reported on visits between Mother and J.C. From April to the end of July 2012, Mother visited J.C. for one hour on Sundays at Woodglen and visits were supervised by Jessica. In August, visits were increased to two hours at J.C.'s home and were supervised by Jessica. Jessica reported Mother was appropriate during visits and attentive to J.C.'s needs. J.C. "goes freely to" [M]other and will hug her. In October 2012, Jessica reported the two hour visitation was ample time because "[Mother] appears ready to go towards the end of the two hour visit and [J.C.] is usually getting ready for a nap."

8

By November 2012, Mother's visits were increased to twice a week for two hours. Jessica monitored the visits on Fridays, and staff at the Orangewood Children's Home (Orangewood) monitored the visits on Sundays. Jessica reported Mother visited consistently but she was sometimes late because she took the bus. Jessica stated Mother was attentive to J.C.'s needs but "appears ready to return the child to [Jessica] after two hours." Orangewood staff reported Mother played with J.C., changed her diaper, and gave her snacks.

In November 2012, Mother told the social worker that Collette's Home agreed to give her family housing if her children were returned. Mother stated she would be overwhelmed if all four children were returned. She requested overnight visits with J.C. and to then have J.C. returned to her care for some time before the other children returned. Mother admitted she did not know how she would be able to work, take the children to and from school, find day care, attend 12-step meetings, and consistently drug test.

The social worker authorized an additional day of supervised visitation. Mother visited J.C. twice a week from 3:30 p.m. to 5:30 p.m. at Collette's Home and Sunday mornings at Orangewood. For the two mid-week visits, a social worker transported J.C. from her day care to Mother. She reported Mother was attentive to J.C.'s needs, was affectionate, played with her, and changed diapers. When J.C. was tired at the end of visits, Mother would cuddle, talk and sing to her.

In January 2013, a different social worker, Stacy Metcalf, was assigned to the case. Metcalf visited Jessica and J.C. and determined the child was being well cared for. Jessica reported J.C. was a happy and well adjusted toddler. J.C. enjoyed visits with Mother and her siblings.

Metcalf also visited Mother who said she was surprised she had been able to maintain her sobriety for seven months, work full time, diligently work on her

12-steps, and go to NA meetings. Mother stated she recognized some of her triggers and had taken proactive steps to avoid a relapse. Metcalf asked Mother about a diluted drug test (considered positive by the testing facility MedTox) submitted on December 28, 2012, and whether she had contact with Father on December 30, 2012. The social worker determined Mother's explanation was not plausible and decided future visits would be monitored.

Jessica stated Mother had an extended visit with J.C. on January 1, 2013, that raised some questions about Mother's ability to care for J.C. on a long-term basis. Jessica stated Mother and J.C. went to a relative's home for a party and to give Mother an additional visit. Jessica stated Mother cared for the child for two to three hours, but when this time period was over, she "ceased caring for the child." Jessica said she told Mother she was frustrated and concerned Mother did not take advantage of the extra time she had with her daughter. Jessica explained that while she was cooking, Mother stopped paying attention to J.C. and got "more carried away with her phone." Jessica stated that while she was cooking she had to ask Mother to keep J.C. occupied or get J.C. something to drink. Based on Mother's conduct, Jessica was concerned Mother may not be able to care for J.C. for long periods of time.

In addition, Jessica questioned if Mother had the "common sense to raise a child." Jessica explained Mother left J.C. asleep on the sofa without a blanket, while Mother was in a separate room laying on a bed with a blanket and "'didn't think to cover the child up or take the child in with her and cuddle with her.'" Jessica concluded Mother was not ready to have J.C. in her care. She added, "'I don't think [she] can cope with the baby. She often gets nervous or frustrated when the child cries.'" Jessica added that sometimes during visits Mother becomes antsy, anxious, and nervous and gives J.C. back to Jessica.

10

In February 2013, Mother told the social worker she had investigated day care and discovered it cost $200 a week. Mother stated she was going to look for a less expensive day care.

During this one year period, SSA's reports also detailed J.C.'s relationship and strong bond to Jessica. In July 2012 the social worker reported in addendum report number 2 that Jessica brought J.C. to visit Mother and her siblings on Sundays at Woodglen. J.C. was very quiet when visiting Mother and her siblings, but was usually noisy when she was with Jessica. The social worker observed J.C. was comfortable and content with Jessica and stayed near Jessica throughout the visit. Jessica was committed to adopting J.C. In the September 2014 addendum report (number 3), the social worker stated J.C. was healthy and developing on target. She appeared attached to Jessica because she climbed on her lap and hugged her without prompting. The following month, the social worker stated in her next addendum report (number 4) that J.C. and Jessica "appear well attached to each other as demonstrated by their playful interactions with each other." The social worker saw J.C. was easily consoled and comforted by Jessica and cried when Jessica left the room. She observed J.C. constantly watched Jessica and waited for her reaction after she played a toy piano. Jessica praised and clapped her hands. The social worker concluded J.C. was being very well cared for.

D. *The 12-Month Review Hearing—Part I*

On February 6, 2013, Judge Brown held a hearing and admitted nine SSA addendum reports. The court heard testimony from Metcalf, Mother, and Betty Medina, a program supervisor at Collette's Home. Metcalf discussed Mother's diluted drug test result in December 2012. Mother told Metcalf the sample was diluted because she could not produce a specimen and the staff told her to drink some water and return to try again. Metcalf called the MedTox lab and asked if this explanation was plausible. She learned the only way to have a dilute test was if Mother had drank two to three gallons of water several hours before the test. Metcalf opined Mother was not ready to have the child

11

returned to her care. Metcalf testified that during the dependency there had been multiple relapses and Mother remained in contact with Father despite knowing he was a trigger for her relapses. Metcalf acknowledged Mother had completed the individual counseling component of her case plan and was attending her 12-step program and drug testing. She agreed Mother was also working full time and had investigated child care options. Metcalf noted Mother had not followed through on finding child care and had not talked to anybody about this issue in several months.

In addition, Metcalf stated Mother was not ready to have J.C. returned based on comments made by Jessica about Mother's supervised visits. Specifically, "Her frustration level, her ability to meet the needs of the child, in addition . . . [Jessica] provided me information in [Mother's] lack of common sense at times and her pattern of being overwhelmed and dropping the children off at different relatives; homes when she can't handle the children." Metcalf had observed a few visits between Mother and J.C. and concluded they were positive. She saw Mother get onto the floor to play with J.C., and Mother played a parental role by redirecting J.C. when the child got "cranky."

Medina testified she worked at the Collette's Home where Mother resides and Mother is one of her clients. Medina stated that to stay at Collette's Home, Mother was required to meet with her once a week, maintain employment, stay sober, attend life skills meetings, be home by an 11 p.m. curfew, and perform daily chores. She said all of the Mother's random drug tests had been negative. Medina stated she has seen Mother visit with J.C. and stated Mother was attentive and played with J.C.

Mother testified being with Father was a trigger that caused her to use drugs. Mother stated she had been sober since April 17, 2012, and she consistently worked on her 12-steps with her sponsor. She maintained the diluted drug test was due to drinking too much liquid beforehand and she noted her prior habit was to miss tests if she had relapsed. She now took steps to ensure she would not have another diluted test

12

result. Mother stated she currently visited J.C. on Mondays and Wednesdays from 3:30 p.m. to 5:30 p.m. and on Sunday mornings. She admitted missing some visits and stated she had made up the time. Mother stated she did not take advantage of the extended visit on December 31 because Jessica left her alone with J.C. at 9:00 p.m. and Mother "freaked out" because she knew she was not allowed overnight visits. Mother went to sleep in a separate room away from J.C. to comply with her case plan. Mother maintained that contrary to Jessica's recollection, she did put a blanket on J.C. as she slept on the couch.

Mother described in detail her visits with J.C. She said she cooked her favorite foods, changed her diaper, and played with toys. She had disciplined J.C. by giving her time outs and J.C. was responsive to being redirected. Mother stated that when J.C. arrived for visits she called her "mommy" and ran to her. At the end of visits, Mother stated she tried to comfort J.C. when she got cranky and tired. Mother believed J.C. looked to her as a parent because she called her mommy and reached out to her when she was crying. At the end of visits they would hug and kiss. Mother stated she was ready to have J.C. returned to her care, she was employed full time, and she found a day care provider for J.C. Mother stated Busy Bee day care had been holding open a spot for J.C. for several months. J.C. could stay with Mother at Collette's Home. Mother stated the court should return J.C. because she had achieved long term sobriety and they were bonded.

After Mother testified, the hearing was continued for two weeks. The court stated the hearing would be a 12-month review but would include issues considered in an 18-month review.

E. *The 12-Month Review—Part II*

On February 22, 2013, the court admitted addendum number 9. The court asked county counsel to summarize what had been discussed in chambers before the hearing. County counsel stated the most recent social worker's report was favorable to

13

Mother and the parties agreed to further postpone the hearing until March 29. During this month, the parties anticipated Mother would take an additional parenting class and "set up some WRAP services with the idea being that if all is going well by the 29th, there may be the possibil[ity] of starting a trial return to Mother." The court noted, "That being the goal of all of this and hearing what has progressed and wanting to encourage and commend [Mother] for the hard work she has accomplished the court is willing to do that. [¶] Under normal circumstances the court does not continue matters six weeks, eight weeks, which is how much time is going to pass before we re-meet. However, I do think that it is appropriate in this case. It gives [Mother] this opportunity and should she do[,] and should the social worker be able to put in place not only the services but to see everything ready, the court will be happy to grant that trial visit return. [¶] So, please understand, we're going to be looking at how well you do. We want to thank you and commend you for the hard work you have done. It's not easy to change your life around. We recognize that. But the kids are worth it. [J.C.] is worth it."

On March 27, 2013, the social worker submitted addendum report number 10. Metcalf stated the recommendation of terminating services remained the same. Mother had not participated in parenting classes. Metcalf stated she gave Mother several referrals to parenting classes. Metcalf stated she initially referred Mother to the FACT (Family and Communities Together) community centers closest to Mother's residence. Mother stated the two FACT centers were too far away. On March 11, 2013, Metcalf referred Mother to KC Services parent education and on March 19, 2013 referred Mother to in-home parent education services provided by the Orange County Child Abuse Prevent Center (OCCAPC). OCCAPC initially turned Mother away, but on March 24 she was accepted and was scheduled to begin classes on April 1, 2013.

Metcalf stated that on March 13 she contacted the WRAP coordinator, Brian Smith, about getting services for Mother. Smith stated J.C. did not meet the

14

qualification for WRAP services and all the family maintenance at risk expansion slots were unavailable. He did not anticipate any openings until June 2013.

F. *The 12-Month Review—Part III*

At the continued hearing on March 29, 2013, the court stated the parties had a chamber's conference without Mother, and after she was present, they held a discussion on the record. The court stated, "We have been discussing the fact that although we're not really ready to say [Mother] is prepared and confident about having [J.C.] returned to her now, we're also not prepared to say she can't do it. [¶] We're going to order some efforts on the part of both [SSA] and the counsel to work [out] a possible plan." The court ordered everyone to return on April 4, 2013, "to work out a plan where [Mother] can prove herself ready for this child. But were're not going to order it today." The court added, "I do want to encourage [Mother] to continue specifically attending [her] first parenting class on April 1st that is scheduled."

G. *The 12-Month Review—Part IV*

The following week, on April 4, 2103, the court concluded the 12-month review hearing. J.C.'s second birthday was just a few weeks away.

The court determined the following findings "presented by stipulation . . . are met by clear and convincing evidence; thus, I approve them." As stated in the stipulation, the court (1) admitted into evidence all the SSA's reports, (2) determined continued supervision of J.C. was necessary, (3) concluded return to the parents would create a substantial risk of detriment, (4) found reasonable services were provided, and (5) terminated the parents' reunification services. Despite terminating services on the record, the court understood services in fact would continue. The court approved the parties' stipulation to continue funding for Mother's "parenting education class as well as for substance abuse testing pending the" .26 hearing. Funding would cease if Mother had a missed, positive or diluted test. As stipulated, the court authorized Mother to have three hours unmonitored visits on Sundays if Mother arranged transportation and told the social

15

worker about her plans 24 hours in advance. "Agency has authority to liberalize or restrict visitation or to lift or reinstate supervision, as deemed necessary, for [J.C.'s] best interest." The court scheduled the .26 hearing for July 31, 2013.

*H.  The Three Months Before the .26 hearing*

A few days before the hearing, SSA filed a report concluding J.C. was adoptable and recommending termination of parental rights. Metcalf reported she had monthly meetings with Jessica and J.C. She opined they were strongly bonded and affectionate with each other. J.C. appeared comfortable and content with Jessica, and she was often smiling or laughing in her presence. J.C. looked to Jessica for reassurance and nurturing. J.C. was developing normally and Jessica reported she was well behaved, fun and very intelligent. Metcalf stated Jessica has been J.C.'s parent since she was five days old. Initially Jessica stated she wanted to adopt J.C., but then extended family persuaded her to be J.C.'s legal guardian. However, after considering the best interests of J.C., Jessica decided the preferable permanent plan for J.C. would be adoption. Jessica was willing and able to adopt her. Moreover, Jessica's two daughters (ages 16 and 14) loved J.C. and they both encouraged Jessica to adopt J.C. Metcalf noted that in addition to Jessica's two daughters, J.C. visited her three siblings and it was anticipated she would maintain a relationship with them because they were placed with maternal aunts as well. Metcalf concluded there was ample evidence Jessica and J.C. were bonded and J.C. felt safe and secure in her home.

Metcalf stated she had not met with Mother but had spoken to her on the telephone. Mother continued to reside at Collette's Home. Since the last hearing, Mother completed one in-home parent education program and a didactic parent course, both offered by OCCAPC. Mother continued to test negative.

The most significant news during this three month period concerned Mother's visits with J.C. Metcalf stated that since February 2013, Mother had three hours of unmonitored visitation. Mother complied with the court's order to tell Metcalf

16

her plans. However, Metcalf stated there had been multiple changes in visitation arrangements after a plan had already been set, making it difficult for Metcalf to observe visits. Nevertheless, Metcalf was able to observe three visits. She stated visits usually consisted of going to the park and a fast food restaurant. Jessica reported J.C. returned from visits in good spirits and appeared to be well cared for.

Metcalf stated she was hesitant to increase visitation further because she had not been able to observe very many visits due to Mother's scheduling changes. Also, there had been an incident on April 6, 2013, during a family party. Jessica reported that while J.C. was in Mother's care, Mother lost track of her and the child crossed a street by herself. Jessica explained Mother was also visiting with her other three children and taking calls from her cellular telephone at the time. Metcalf determined Mother could only have unsupervised visits with J.C. when the other siblings were not present.

Metcalf admitted Mother consistently and appropriately visited with J.C. after her removal. Metcalf opined, "Although [J.C.] is familiar with [Mother] and has a relationship with [Mother], it is the undersigned's observation [that Jessica] . . . is more of a parental figure to the child." Metcalf stated Jessica's nurturing and discipline have been consistent and J.C. refers to her as "mom" despite Jessica's attempts to have J.C. call her "tia." Metcalf stated J.C. would not suffer any detrimental social or emotional effects if parental rights were terminated, but there would be a detrimental effect if J.C. were removed from Jessica's care.

*I. The .26 hearing—Part I*

On July 31, 2013, the court considered and accepted into evidence the parties' stipulation to continue the .26 hearing one additional month (to August 28, 2013). The court ordered SSA to evaluate whether overnight visits with Mother were appropriate.

The same day, Mother filed a section 388 modification request, seeking return of J.C. on a plan of family maintenance or a 60-day trial release. She declared she

17

has been sober since April 2012, she completed numerous parenting classes, and she was mentally healthy and able to parent J.C. for the rest of her life. Mother stated she received a six-month extension to stay at Collette's Home (ending September 17, 2013). She had maintained full-time employment and saved nearly $3,000. She intended to use her savings to lease an apartment after her time at Collette's Home ends. If J.C. were returned to Mother care, she would be moved to Collette's Home's family unit and receive assistance with food vouchers, clothing, bus transportation, child care, and personal items. Mother's case manager had helped her develop an action plan to maintain full time employment, start a savings account, and become a responsible adult. Mother discussed her path to sobriety and how she maintained her recovery.

Mother stated she enjoyed five hours of unmonitored visits each week with J.C. She described the many activities she and J.C. enjoyed doing together during their visits. She stated, "It is sometimes difficult to leave at the end of visits and [J.C.] often says she wants to come home with me." Mother believed J.C. should come home with her because "no one can love her or ensure her wellbeing more than I can." She added J.C. now relied on her for comfort and support. They had a mother-daughter bond and she loved J.C. dearly and cherished every moment they had together. She believed J.C. felt the same way because after visits J.C. sometimes cried and said she loved Mother. Often on Sunday visits, J.C. says "'bye mommy, I love you. I'll see you tomorrow.'" The court ordered it would consider the section 388 motion the same day as the continued .26 hearing date.

*J. The .26 hearing—Part II*

SSA prepared an addendum report on August 23, 2013. Metcalf stated she followed the court's order to assess Mother's home for overnight visits. Metcalf noted Mother had not moved to the family unit as represented by her counsel.

Metcalf visited Mother's apartment and noticed there had been no accommodations "to safely house a toddler." For example, the electrical outlets were not

18

covered, the blind adjustment strings could be reached by a toddler, there were two large television sets left unsecure on a desk, and there was an unsafe decorative metal stair railing leading to the second floor. Metcalf told Mother these safety issues would have to be resolved before an overnight visit would be authorized. When Metcalf returned several days later she saw Mother had addressed all the safety concerns except for leaving one television unsecured on a desk. Metcalf stated the television should be strapped to a wall or placed on the floor. Mother stated she understood the safety hazard because she knew someone whose child was killed when a television set had fallen on the child. Mother put the television set on the ground until it could be strapped down. Metcalf approved Mother's home for an overnight visit.

Mother had her first overnight visit from Wednesday August 14 to Thursday August 15, 2103. Jessica reported the child looked fine and behaved normally after the visit. Jessica said Mother called her during the night because J.C. was crying for Jessica and wanted to go home. One week later, Jessica reported she had learned from the day care teachers that J.C. had started biting and pinching other children, which was a change from her normal behavior. On August 21, 2013, Metcalf spoke with the teacher, who said there had been a significant change with J.C.'s behavior for the last two weeks. She was bullying other children and was more aggressive.

On August 28, 2013, the court considered and accepted the parties' stipulation to continue the hearing for an additional month. It scheduled the hearing for September 24, 2013. On that date, J.C. would be two years and five months old. It had been 29 months since J.C. was taken into protective custody following her birth.

K. *The .26 hearing—Part III*

On September 20, 2103, SSA filed a lengthy addendum report discussing several problems concerning visitation. Mother had been approved for one overnight visit per week and one unmonitored visit every Wednesday night. With respect to the

19

Wednesday night visits, Mother was required to pick up J.C. from her day care in the evening and bring her back to day care or to Jessica's home.

Metcalf reported that for the past six weeks, Mother had cancelled most Wednesday night visits and sometimes failed to pick up J.C. without notifying Jessica. Mother also changed the visitation times for overnights without fully communicating her plans to Jessica. Metcalf noted Mother's failure to timely communicate the changes caused Jessica "a great deal of frustration." Jessica worked full time and was a single mother with two other children. When Mother suddenly canceled visits, Jessica was left "scrambling" to find someone else to pick up J.C. from her day care. Jessica requested Wednesday visits be cancelled.

Metcalf provided a detail report about Mother's lack of responsibility, forethought, planning, and communication regarding the Wednesday night visits over a period of six weeks. She stated Mother was scheduled to pick up J.C. from day care on Wednesday, August 7, but failed to notify Jessica she changed her plans to meet with Metcalf that night. Metcalf stated she clearly told Mother she needed to notify Jessica.

On Friday, August 16, Mother asked for a visit the following Monday, August 19. Jessica agreed. On August 19, Jessica texted Mother at 2 p.m. to ask if she was going to pick up the child. Mother stated she was ill and would not be coming.

On August 21, Jessica received a text message at 6:40 a.m. indicating she could not pick up J.C. that day. Jessica reminded Mother that for her next visit on Saturday August 24, Mother needed to arrive between 8 and 8:30 a.m. because Jessica needed to be at work by 9 a.m. When Mother did not arrive on time, Jessica called her. Mother stated she could not pick up J.C. until 10 a.m., following her drug test and asserted Metcalf had approved a 10 a.m. pick up. Metcalf stated this was untrue because she did not approve a 10 a.m. pick up and Mother was not called to drug test that day. Metcalf added Mother threatened Jessica, stating she would call SSA regarding Jessica's children.

20

The following Wednesday, August 28, 2013, Mother sent a text at 10:31 a.m. cancelling her visit due to a dental appointment. That weekend, Mother told Jessica on Friday she could not pickup J.C. until 10 a.m. Saturday morning, August 31. Jessica objected, telling Mother she needed to pick up J.C. earlier because she had to be at work at 9 a.m. Mother asserted the juvenile court and Metcalf designated 10 a.m. as the pick up time. Metcalf stated this was untrue and she had told Mother to arrange visits with Jessica to accommodate both of their schedules.

The next scheduled visit was for Wednesday, September 4. Mother texted Jessica at 1:45 p.m. cancelling the visit and asking for a visit the following day. Jessica agreed and it was arranged Mother would pick up J.C. between 3:30 p.m. and 6 p.m. Mother notified Jessica at 3:51 p.m. she was cancelling that visit. She texted "super sorry not going [to] get baby just got home going to sleep, be there for sure [on] Saturday . . . ."

Wednesday, September 11 was the next scheduled mid-week visit. The day before, Mother said she would have to cancel the visit. However, on September 11, Mother notified Jessica she could pick up J.C. She was significantly late in picking up J.C. She arrived at 6:25 p.m., when the time to pick up J.C. was 5 p.m. and the facility's final pick up time was 6 p.m. On Tuesday, September 17, Mother told Jessica she was too sick to pick up J.C. on Wednesday, September 18.

Interestingly, Mother consistently took J.C. for overnight visits. Metcalf found it disconcerting that out of the six weeks Mother had been approved for Wednesday night visits, she had only been able to pick up J.C. one time. Metcalf was concerned Mother was not making J.C. a priority and she did not have the level of responsibility need to take care of J.C.

In her report, Metcalf provided some new information about Mother. Collette's Home had extended her stay until October 1, 2013. Metcalf offered Mother housing referrals. All drug tests in August and September were negative. Metcalf listed the dates of testing, noting none conflicted with Mother's scheduled visits with J.C.

21

On September 24, 2014, the court considered Mother's 388 petition in conjunction with the .26 hearing. The court first heard testimony from Mother, who stated she was currently residing at Collette's Home and randomly drug tested twice a month. With respect to visits, Mother admitted she had missed a few visits. She stated there was initially a misunderstanding about the time Saturday visits would start. Mother acknowledged she missed two Wednesday night visits and explained it was because she had been working a graveyard shift. Mother testified she timely notified Jessica about the cancelled visits. Mother recalled on one occasion she gave Jessica 24 hours notice, and another time gave her one week's notice. She disagreed with Metcalf's report stating she neglected to notify Jessica or any suggestion Mother constantly canceled and changed plans last minute.

When questioned about her graveyard shift, Mother explained she would work at night and go home at 7 a.m. She explained her employer required her to work graveyard shifts anytime she missed work due to court dates. Mother stated that following her graveyard shift she would sleep for a few hours, wake up for lunch or for a drug test if necessary, and then go back to bed. Mother said she could not pick up J.C. from her day care at 6 p.m. because she would be sleeping.

Mother testified J.C. identified her as her mother and came to Mother whenever she got hurt looking for comfort. Mother said J.C. cried and called for her when she was dropped off after visits. Mother described her activities with J.C. and concluded they had a strong bond. She explained that when Jessica is with them, J.C. called Jessica "Nina" (another word for godmother) and she called Mother "mom." Mother said J.C. looked to her for care and support even when Jessica was present.

Metcalf testified consistently with the information contained in her reports. She surmised Mother was not responsible enough to have J.C. in her care full time. She stated, "There's some concerns about her being preoccupied, not putting the child first, prioritizing the child. [Mother] is very involved in her recovery, in her meetings. And at

22

one point she even asked if it would appropriate to go back to school. I think she's reoccupied with her life now, and I don't think she would prioritize the child." Metcalf noted Mother had missed visits with J.C. and each time her communication was poor. Mother had also reduced visits with her other three children.

Metcalf testified the various visitation issues suggested Mother could not care for J.C. full time. She explained, "Mother doesn't have any forethought with regards with what to do if certain instances come up. Such as if she can't get to the day care center on time, she doesn't make a contingency plan; and she cancels with the caretaker if she can't make it for any reason, and that's not something that can happen on a full-time basis. You have to have forethought and make arrangements for the care of the child, if you can't be there. You can't just cancel."

Metcalf questioned why Mother did not notice for herself the clear safety issues present in her apartment before Metcalf's inspection. Mother admitted she knew a child died from being crushed by a television yet did nothing about her own televisions in anticipation of having J.C. for overnight visits. Metcalf believed J.C. saw Jessica as her mother and primary caregiver, and saw Mother as an aunt figure in her life.

After considering argument from the parties' counsel, the court denied the 388 petition. The court determined Mother likely satisfied the first prong of the test used in evaluating 388 petitions because there had been changed circumstances from the court's prior order. Specifically, Mother had completed several parenting classes and had maintained her sobriety for over a year. The court stated Mother's sincere commitment to sobriety was not the sole test for a change of circumstances.

The court concluded it would not be in J.C.'s best interests to be returned to Mother. The court reached this conclusion based on the information in SSA's reports and Mother's testimony. It stated, "Her general neglect of children really from all of her adult life has not been eliminated by her commitment now to sobriety. It takes more to be a mother than to give birth. [¶] And in this case[,] allowing a two-year-old to run

23

unsupervised when she is responsible for the life of that child and that child running across a street is absolute proof that she is not ready to be responsible for the child's life day-by-day, 24/7. [¶] She has shown . . . she is not ready for that kind of commitment by choosing anything and everything else instead of her Wednesday night visits and not conducting them in a timely and responsible fashion. She is unable . . . to place the priority of [J.C.] over all of her other chosen relationships and commitments."

The court asked if the parties would agree to proceed to the .26 hearing based on the evidence already presented. Mother's counsel stated she had a few more questions to ask Metcalf. The court permitted counsel to question Metcalf about the basis for her recommendation to terminate parental rights and her determination J.C. was adoptable. Mother's counsel argued the court should apply the parental benefit exception to termination of Mother's parental rights.

The court concluded J.C. was adoptable and it terminated parental rights. It determined Mother had not met her burden of proving the parental benefit exception to termination. The court stated Mother clearly had a "new interest" in reunifying with her child, but failed to comply with her reunification plan in a timely fashion. The court concluded Mother "failed to make consistent and regular visitation with [J.C.]. And those choices by her have resulted in disruption for [Jessica's] family which includes [J.C.'s ] disappointment and behavior changes in [J.C.]."

The court determined there were many factual conflicts about visits and it found Metcalf to be a credible and sincere witness, albeit not very prepared or persuasive. The court concluded that after observing Mother's demeanor during her testimony, "I have come to the conclusion that I cannot believe [Mother] as being either accurate in her recall of dates, times and orders[,] or sincere." It added, "[Mother] for whatever reason . . . [is] consistently . . . in conflict with [Jessica's] recitation of any details of these visitation issues. [¶] But [Mother] relies on explanations which have been shown specifically to be false." For example, Mother stated she missed one visit because she

24

had to drug test, and Metcalf presented evidence she had not been called to test that day. The court mentioned another occasion when Mother stated she was sleeping following a graveyard shift and could not pick up J.C. but there was evidence she could have slept and still picked up J.C. later in the evening.

As for the second prong of the benefit exception, the court explained it needed to balance the child's interests and need for permanence against the child's interests in continuing her relationship with Mother. The court concluded Jessica was the mother figure in J.C.'s life, not Mother. Although Mother and J.C. had a bond, it was that of a relative. The court found significant that on her first overnight with Mother, J.C. cried because she wanted to return to her home with Jessica. And it was telling that Mother called Jessica because she knew Jessica would know how to care for J.C.

In addition, the court found relevant Mother's history of leaving her children with other people and concluded Mother apparently forgot about J.C. the day she wandered alone across the street. The court found it telling Mother set dental appointments on the day she was scheduled to visit J.C., and she waited until after the pick up time to tell Jessica she was cancelling. The court reasoned that even if Mother had some sort of sibling rivalry issue with Jessica, her behavior was upsetting and hurtful to J.C., who was anticipating the visit and did not get one. The court also did not believe Mother's testimony she thought the court and Metcalf initially ordered the overnight pick up time to begin at 10 a.m. The court said Mother's decision to invoke the court's authority when Jessica complained, knowing the court had not ordered a 10 a.m. pick up time, "was an act of fraudulent behavior." Finally, the court concluded it would be harmful to J.C. to remove her from the only home she has ever known. The court stated overnight visits would no longer be approved by the court. It authorized good-bye visits with Mother and Father.

25

II

Mother contends she made a sufficient showing to warrant an order granting her custody of J.C. and vacating the section .26 hearing. We disagree.

A juvenile court dependency order may be changed, modified, or set aside at any time. (§ 385.) A parent may petition the court for such a modification on grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The parent, however, must also show that the proposed change would promote the best interests of the child. (§ 388, subd. (a)(2); *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Id*. at pp. 318-319.) In this case, the court did not abuse its discretion.

We conclude Mother's long term sobriety and renewed interest in parenting classes showed changed circumstances, but Mother did not establish that an order giving her custody of J.C. would be in the child's best interests. To understand the element of best interests in the context of a 388 petition filed, as in this case, on the eve of the .26 hearing, we turn to the Supreme Court's language in *Stephanie M., supra,* 7 Cal.4th 295: "[A]t this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H.* [1993] 5 Cal.4th 295, 309) . . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 317; see also *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 [on eve of .26 hearing, children's interest in stability was court's foremost concern and outweighed any interest in reunification].)

26

In short, Mother's evidence did not establish J.C.'s need for permanency and stability would be advanced by an order returning J.C. to her care. The evidence showed J.C. had a loving and stable placement with her maternal aunt Jessica, who had cared for J.C. since her birth. Jessica had assumed full parental responsibilities and care for J.C., and by the time of the hearing on the section 388 petition, J.C. was two and one half years old. Jessica was the only constant and stable parent J.C. had ever known. Jessica and her two daughters felt like J.C. was part of their family. Metcalf had no doubt J.C. and Jessica were strongly bonded to each other. Mother does not dispute Jessica and J.C.'s relationship, and in her petition she stated she would strive to preserve that bond if granted custody or a temporary release. Mother failed to present any evidence J.C.'s best interests in *permanency and stability* would be furthered by the proposed modification under *Stephanie M., supra*, 7 Cal.4th at page 317.

On appeal, Mother ignores the Supreme Court's language in *Stephanie M.* and instead urges this court, in evaluating J.C.'s best interests, to apply factors delineated by the appellate court in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532. Those factors are: the seriousness of the problem leading to dependency and the reason that problem was not overcome; the strength of relative bonds between the dependent children to both parent and caretakers; the degree to which the problem may be easily removed or ameliorated; and the degree to which it actually has been. (*Ibid.*) She argues she overcame the most serious problem leading to dependency (drug addiction) and the relief being sought "would preserve the bond she shared with [J.C.] [J.C.] deserved an opportunity to know a mother who worked so hard to maintain their relationship." She concludes a change of custody would not be detrimental. In essence, Mother is asserting it is in J.C.'s best interests to preserve the biological parent child relationship that she has worked diligently to achieve over the past year.

27

It is true a parent and a child share a fundamental interest in reuniting up to the point at which reunification efforts cease. (*In re R.H.* (2009) 170 Cal.App.4th 678, 697.) However, the interests of the parent and the child have diverged by the point of a .26 hearing to select and implement a child's permanent plan. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) "[C]hildren have a fundamental independent interest in belonging to a family unit [citation] and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*Marilyn H., supra*, 5 Cal.4th at p. 306.) Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Consequently, after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*Marilyn H., supra*, 5 Cal.4th at p. 309.) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 317.) J.C.'s best interests are not to further delay permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify. Mother's best interests are simply no longer the focus.

For the above reasons, we decline to apply the *Kimberly F.* factors if for no other reason than they do not take into account the Supreme Court's analysis in *Stephanie M.,* applicable after reunification efforts have been terminated. As stated by one treatise, "[I]n such circumstances, the approach of the court in the case of . . . *Kimberly F.* . . . may not be appropriate since it fails to give full consideration to this shift in focus." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (LexisNexis 2014) § 2-140[5], p. 2–473.) We instead follow the direction of our Supreme Court, holding that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change

will advance the child's need for permanency and stability. As stated above, Mother's 388 petition fails to address these points and therefore we conclude the court did not err in denying the petition.

In closing, we wish to express our concern that the trial court deemed it appropriate to reward Mother with additional services (after terminating services) and further liberalized visits when the focus should have been entirely on J.C.'s best interests. As the court later came to realize, there was ample evidence J.C. would be devastated and suffer great detriment if she were removed from Jessica's home after two and one-half years. It is the only loving, safe, and stable home she has ever known. This case brings into sharper focus the reasons why the statutory scheme authorizes courts to terminate services and schedule a .26 hearing at the six-month review date for children younger than three. Section 361.5 provides services will not exceed six months if the child is under the age of three, unless the court finds a substantial probability of return with an extended 12- or 18-month period. These rules were enacted to circumvent the very situation we see in the case before us. Based on the record, J.C.'s best interests at the age of six months and at twelve months were blaringly clear because Mother had relapsed multiple times and could not offer J.C. a stable home. The Legislature understood children such as J.C. have a critical need to quickly find a secure and stable placement. It was detrimental to this infant's best interests, and it was ultimately unkind to Mother, to continue the case an additional 16 months.

### III

At a .26 permanency planning hearing, the court may order one of three alternative plans: (1) adoption (necessitating the termination of parental rights); (2) guardianship; or (3) long-term foster care. (§ 366.26, subd. (c)(1), (c)(4)(A).) If the child is adoptable, there is a strong preference for adoption over the other alternatives. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297 (*S.B.*).) Once the court determines the child is adoptable (as J.C. indisputably was), a parent seeking a less restrictive plan has the

burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). (*S.B., supra,* 164 Cal.App.4th at p. 297.)

Section 366.26, subdivision (c)(1)(B)(i) provides for one such exception when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The "benefit" necessary to trigger this exception has been judicially construed to mean, "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); see also *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347-1348 (*Jasmine D.*).)

A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 998.) It is not enough to show that the parent and child have a friendly and loving relationship. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419 (*Beatrice M.*).) "'Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . .'" (*Beatrice M., supra,* 29 Cal.App.4th at p. 1419.) For the exception to apply, "a *parental* relationship is necessary[.]" (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) "'While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.]" (*Ibid.*)

30

Mother suggests the law has departed from the *Autumn H.* line of cases described above and the benefit exception no longer requires proof the child has a primary attachment to a parent or that the parent maintained day to day contact. (Citing *S.B., supra,* 164 Cal.App.4th at p. 297.) Not so. Moreover, this case is nothing like the *S.B.* case.

In the *S.B.* case, a three-year-old child was removed from the custody of her father who had been her primary caregiver. (*S.B., supra,* 164 Cal.App.4th at p. 298.) He had a 30-year methamphetamine addiction, was in poor health, and had been diagnosed with combat-related posttraumatic stress disorder following his service in the Vietnam War. The father immediately acknowledged his drug use was inexcusable and fully complied with his case plan, remained drug free, and regularly visited his daughter three days a week. (*S.B., supra,* 164 Cal.App.4th at pp. 294-295, 298.) Even after a year apart, when the visits ended, the child continued to become upset and wanted to leave with her father. (*Id.* at p. 298.)

The appellate court in *S.B.* reversed the termination of parental rights, finding substantial evidence to support application of the parental benefit exception. (*S.B., supra,* 164 Cal.App.4th at p. 301.) The court determined that despite the lack of daily contact, the father continued his significant relationship with the child. Rather than a visitor or playmate relationship, the court found a true parental relationship that had developed during the child's first three years life when she lived with her father, and which continued to develop while they lived apart. (*Id.* at pp. 298-299.) The court concluded, "[T]he only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]. [Citation.]" (*Id.* at p. 301.)

The *S.B.* case has been criticized by other appellate courts for its suggestion the exception applies if the child merely "derived some measure of benefit" from the parental relationship. (*S.B., supra,* 164 Cal.App.4th at p. 301.) The same appellate court that authored the *S.B.* case cautioned in *In re Jason J.* (2009) 175 Cal.App.4th 922, 937:

31

"The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." More recently, the same court emphasized in *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 that the *S.B.* case must be "confined to its extraordinary facts. [The *S.B.* case] does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact."

## A. Standard of Review

Here, the trial court concluded that J.C. was adoptable and terminated parental rights. Case law is divided as to the correct standard for appellate review of an order determining the applicability of the parental benefit exception. Most published decisions have reviewed such orders for substantial evidence. (See, e.g., *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333; *Autumn H., supra*, 27 Cal.App.4th at p. 576.) Others have applied an abuse of discretion standard. (See, e.g., *Jasmine D., supra,* 78 Cal.App.4th at p. 1351; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations. "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination." (*Id.* at p. 1314.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes "'a *compelling reason* for determining that termination would be

32

detrimental to the child.'" (*Id.* at p. 1315.)  This "'"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption[,]' is appropriately reviewed under the deferential abuse of discretion standard." (*Ibid*; see also *In re K.P.* (2010) 203 Cal.App.4th 614, 621-622 [finding *Bailey J.* approach persuasive].)  We are likewise persuaded to apply the *Bailey J.* approach.

B. *The First Prong—Visitation*

Turning to the first prong, the court determined Mother "failed to make consistent and regular visitation with [J.C.]."  The court recognized the evidence with respect to visitation during the six weeks leading to the hearing was disputed, and it concluded Mother's version of events was not credible.  It accepted the social worker's account of five missed Wednesday night visits, as well as the troubling manner of Mother's cancellations and pattern of changing her plans last minute.  We conclude substantial evidence supports this determination.  In addition to the last six weeks of the dependency, there were other periods of time when she failed to regularly visit J.C., particularly during Mother's relapses in 2011.

Mother points to Metcalf's report prepared in July 2013 for the .26 hearing that contained the factual finding Mother "consistently visited" J.C.  Mother argues, "A handful of missed visits in August and September 2013, due to [M]other's rigorous work schedule, do not obviate her long-term record of regular visitation and contact."  We conclude this statement is belied by the record.  The social worker did not excuse the missed visits in August and September as being due to work obligations.  Mother scheduled a dental appointment that conflicted with one Wednesday night visit.  We recognize Mother testified she missed a few visits because she worked the graveyard shift the night before.  However, upon further questioning it was revealed that on those days

Mother got off work at 7 a.m. and would sleep only a short time before waking up to eat lunch and take care of other various matters before returning to bed for additional sleep.

It appears Mother decided this plan of action was more important than picking up J.C. from her day care at 6 p.m. It is telling that Mother did not miss a single overnight visit during the same time period, but left for Jessica the mundane but important job of bringing J.C. home after a long day at day care. Mother did not take advantage of this important opportunity to be a parent to J.C., to ask her about her day, listen to her feelings, or shower her with affection. Mother shirked her parental responsibility to make J.C.'s diner and get her ready for bed. Despite all the well-documented parenting classes, it did not occur to Mother that choosing to sleep rather than pick up her toddler, as had been arranged, was not providing J.C. the loving stable relationship the child deserved.

## C. The Second Prong—Weighing the Benefits

The case is a close call. There was significant evidence on both sides of the issue. However, after carefully reviewing the record it cannot be said the court abused its discretion in concluding the benefit of maintaining the parent-child relationship outweighed the benefit of adoption. (§ 366.26(c)(1)(B)(i).)

As described in *Autumn H.,* the beneficial relationship exception must be examined on a case by case basis, taking to account the many variables that can affect the parent-child relationship. In this case, J.C. is very young and has spent her entire life (29 months) living apart from Mother. For most of the dependency period, J.C. relied on Jessica to meet her daily needs. Although Mother appears have achieved long lasting sobriety, which is commendable, her limited time with J.C. was monitored for the majority of these proceedings. For large periods of time, Mother visited with J.C. for just a few hours each week and Jessica was always there to assist her with the baby. The record shows that the visits were always enjoyable, but many times Mother would become anxious and hand the child back to Jessica. Mother was described as being ready

34

for visits to end after just two hours. Mother was sometimes preoccupied and essentially forgot about J.C. This was evidenced by the times Mother left J.C. uncovered and sleeping on the couch as Mother lay comfortably under covers in the next room, when Mother left the toddler unsupervised to walk across the street alone, and more recently when Mother failed to make timely arrangements to pick J.C. up from day care.

Mother contends the evidence demonstrates J.C. would benefit from continued contact with her given that they had positive visits and she felt they shared a strong bond and a significant relationship. Mother asserts she appropriately cared for J.C., and she appeared to enjoy their visits. But a successful parental benefit exception claim rests not on whether the parent/child contacts "'confer some incidental benefit to the child . . . .'" (*Beatrice M.*, *supra,* 29 Cal.App.4th at pp. 1418-1419.) As SSA aptly observed, Mother, at best, established she had pleasant contacts with a child for whom she never provided primary care, and with whom she barely progressed to unmonitored contact.

*In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*), and *Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*), illustrate the compelling evidence necessary to establish the benefit exception. In *Jerome D.*, *supra,* 84 Cal.App.4th at page 1206, the child "seemed lonely, sad, and . . . 'the odd child out'" in his placement. He wanted to live with his mother and had enjoyed unsupervised night visits in her home. (*Id.* at pp. 1206-1207.) A psychologist opined the child and his mother "shared a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond." (*Id.* at p. 1207.) The court concluded keeping parental rights intact would prevent the child's "position as the odd child out in [placement] from becoming entrenched by a cessation of visits and the loss of his mother while [his half-siblings] continued to enjoy visits and remained [the mother's] children." (*Id*. at p. 1208.)

In *Amber M.*, *supra*, 103 Cal.App.4th at page 690, the court reversed termination of parental rights where a psychologist, therapists, and the court-appointed

35

special advocate uniformly concluded "a beneficial parental relationship . . . clearly outweigh[ed] the benefit of adoption." Additionally, two older children had a "strong primary bond" with their mother, and the younger child was "very strongly attached to her." (*Ibid*.) If the adoptions had proceeded, the children would have been adopted in separate groups. (*Id*. at pp. 690-691.)

Here, Mother did not demonstrate harm would have ensued from termination of parental rights similar to that demonstrated in *Amber M.* or *Jerome D.* At the permanency stage, the bond the child shares with the parent and the harm that might arise from terminating parental rights must be balanced against what is to be gained in a permanent stable home, and "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) The parental benefit exception will apply only where the parent has demonstrated the benefits to the child of continuing the parental relationship outweigh the benefits of permanence through adoption.

Nothing in the record suggests the benefit J.C. might gain by continuing her relationship with Mother is outweighed by the well being she would gain from having a permanent home. While the record establishes Mother had a bond with J.C., there was little evidence J.C. had a similar bond with Mother. The court reasonably concluded J.C.'s outward affection for Mother proved loving contact on the level of a friendly visitor relationship and not necessarily a substantial positive attachment. Many toddlers are cuddly, effusively loving, and affectionate. J.C. did not display the depth of emotional attachment to Mother that *Amber M.* or *Jerome D.* (or *S.B.* as described earlier) displayed to their respective parents. To the contrary, the record showed J.C. easily separated from Mother at the conclusion of visits, and readily returned to Jessica's home. There was no bonding study or evidence, other than Mother's self-serving declaration, to counter the social worker's conclusion J.C. would not suffer any detriment. In light of all

36

of the above, we conclude the court did not abuse its discretion by ruling the parental benefit exception did not apply.

IV

The orders denying the 388 petition and terminating parental rights are affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


THOMPSON, J.


37

Filed 5/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G049095 |
| Plaintiff and Respondent, | (Super. Ct. No. DP021151J) |
| v. | ORDER |
| M.C., | |
| Defendant and Appellant. | |

The County Council of Orange County has requested that our opinion filed May 6, 2014, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.
The opinion is ordered published in the Official Reports.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

THOMPSON, J.