Filed 3/27/23 In re J.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.R., Defendant and Appellant. | E079900 <br><br> (Super.Ct.No. J289592) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Lynn M. Poncin, Judge. Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Tiffany Lok, Deputy County Counsel, for Plaintiff and Respondent.

1

N.R. (Mother) filed a petition under Welfare and Institutions Code[1] section 388 asking the juvenile court either to return her daughter, J.J., to her custody with family maintenance services or to order reunification services for her. The juvenile court summarily denied the petition and subsequently terminated parental rights at the section 366.26 hearing. Mother appeals from the order denying her section 388 petition and the order terminating her parental rights. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. PAST CHILD WELFARE HISTORY

In 2008, San Bernardino County Children and Family Services (Department) investigated a referral that Mother was exhibiting impulsive and angry behaviors in the hospital before and after giving birth to J.J.'s older half sibling. It was reported that Mother had a learning disability with poor coping skills, had been living an itinerant lifestyle moving from place to place, had few provisions for the baby, and no definite home to go to upon discharge from the hospital. Mother agreed to a plan of voluntary family maintenance services under Department supervision. Mother was resistant with infant health workers, failed to follow up on a referral to obtain services from the Inland Regional Center, and did not comply with medical staff's instructions on how to care for the baby. Mother failed to follow feeding instructions, mixing twice the amount of infant formula, making the mixture too thick and creating a choking hazard. Mother continued to allow the baby to sleep on its stomach, putting him at risk of sudden infant death

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

syndrome, after being advised not to. The child was removed from Mother's custody in 2008, reunification services were terminated, and Mother's parental rights were terminated in 2009.

In 2004, while the Department was investigating allegations that Mother was unable to care for her first child and had covered the baby with a pillow during feeding, Mother made arrangements for that child to reside with relatives who were subsequently granted legal guardianship. In 2010, Mother's third child was removed from her care at birth and placed with the same relatives because Mother was incarcerated. Both of those children were removed from the relatives' custody, and Mother's parental rights were terminated as to them in 2011.

B.    DETENTION

The present case began in May 2021. When J.J. was three days old, the Department received a referral alleging general neglect. She was born prematurely and weighed only three pounds six ounces, requiring respiratory support in the neonatal intensive care unit. The reporting party informed the Department that Mother has "childlike" behavior and communication issues. Mother herself reported that she has a learning disability. It was also reported that J.J. (Father)[2] was very aggressive and controlling, yelling at Mother, using profanity, and preventing Mother from speaking for herself. The reporting party expressed concern that Mother would be unable to care for J.J. given her reported history with her previous children, her lack of a support system,

---

[2] Father is not a party to this appeal.

3

and the fact that she would frequently be left alone with J.J. because Father went to Los Angeles to work for several days at a time.

To investigate Mother's ability to care for J.J. and to identify any possible support network, the Department interviewed Mother, Father, and two collateral contacts who wished to remain anonymous. Mother reported that she has a learning disability for which she receives monthly benefits, and that she had three children previously removed from her care, but Mother stated the children were removed because of a false allegation that she had tried to suffocate her first baby while in the hospital. Mother admitted to using marijuana during the pregnancy and self-reported that she was diagnosed with bipolar disorder and depression but is not currently taking any medication for her mental illness.

Throughout the interview, Father did most of the talking and was observed telling Mother what to say, frequently cutting her off, raising his voice, and telling Mother to stop talking. This was a particular concern because Department records showed that Mother had a long history of staying with people who took advantage of her and her monthly disability income, and who subjected her to abuse. When asked about their plans to care for J.J., both parents stated that Mother would take care of the infant on her own. Mother stated that she does not need any help caring for the infant.

The two collateral contacts were interviewed separately, and both were familiar with Mother's developmental delays. Both reported that she needed a lot of guidance and support, but neither would be available to provide such ongoing support. They stated that

4

Mother would not be able to care for J.J. on her own, that the parents were not stable enough to care for an infant at that time, and one also expressed concerns about Father's behavior toward Mother.

The Department had immediate concerns for J.J.'s safety given Mother's child welfare history, her lack of a support network, and both parents' minimizing or denying Mother's need for ongoing assistance in order to care for an infant, as well as Father's efforts to control Mother and silence her when she tries to speak for herself. J.J. was detained pursuant to a detention warrant on June 18, 2021.

On June 22, 2021, the Department filed the initial section 300 petition alleging that J.J. came within subdivisions (b)(1) (failure to protect) and (j) (abuse or neglect of sibling). Both parents appeared by telephone at the detention hearing held the following day and were appointed counsel. The juvenile court found a prima facie case had been established, detained J.J. in temporary foster care, and ordered weekly supervised visitation.

C. JURISDICTION/DISPOSITION

On July 14, 2021, the Department filed a first amended petition alleging that Mother's parental rights as to J.J.'s three older half siblings had been terminated in 2009 and 2011, that Mother was unable to provide adequate care and supervision to her previous child who was removed from her care in 2008, that Mother is involved in a domestic violence relationship with Father, that Mother has an untreated mental health

diagnosis, and that Father knew or should have known that J.J. would be at risk if left in Mother's care.

Both parents were interviewed again for the jurisdiction/disposition report. Father denied any domestic violence but admitted telling Mother that she did not have to tell the Department anything. He admitted being "a little aggressive" with Mother but stated this was for Mother's protection to prevent others from taking advantage of her. Father acknowledged that Mother needs help with some tasks, such as cooking, and said: " 'She's slow, . . . I do a lot of things for her[,] but she can take care of her own children.' " He reiterated that Mother's child welfare history was based on lies and false allegations, and that J.J. would be " 'in good hands' " if left in Mother's care.

Mother also denied domestic violence. She acknowledged that she previously took medication for her psychiatric diagnoses and stopped without seeking medical advice but denied needing medication or other mental health treatment. Mother reported she had never been on an involuntary psychiatric hold, although Department records showed she had been hospitalized under section 5150 on May 9, 2009, requiring the court to continue a May 11, 2009, hearing. Mother acknowledged her learning disability, but denied that she was unable to meet the needs of her children: " 'I can read[,] but I can't understand what I'm reading. But I can take care of my child.' " She stated that she had been enrolled in an infant health program that provided assistance with a previous child, " '[b]ut because I didn't need the help, I left it. I can do everything on my own. My learning disability doesn't affect me.' " The Department attached to its

6

jurisdiction/disposition report documentation of the previous dependency proceedings involving J.J.'s older half siblings.

On July 15, 2021, Mother's counsel requested the appointment of a guardian ad litem for Mother. After conducting an inquiry, the juvenile court determined that Mother was not capable of assisting her attorney and appointed a guardian ad litem. The court also granted Father's request for paternity testing and continued the jurisdiction and disposition hearing to allow for receipt of the paternity testing results and for the guardian ad litem to prepare.

The Department filed an addendum report on August 13, 2021, recommending: (1) that Father be found J.J.'s presumed father based on the paternity testing results, (2) that the allegations in the amended petition be found true, (3) that J.J. be removed from the custody of both parents, (4) that Father be provided with family reunification services, and (5) that Mother be bypassed for reunification services under section 361.5, subdivisions (b)(10) and (b)(11). The addendum report noted several concerns with Mother's feeding of the child during supervised visits. During one visit, Mother had refused to feed the baby because she did not " 'want to run out of formula.' " The social worker had to explain to Mother the importance of maintaining the baby's feeding schedule and told her that she could be provided with more formula. On another visit, Mother had overfed the baby, which caused her to vomit and stay awake crying that night. On another visit, Mother wanted to feed the baby water instead of formula. The Department noted that these were the same concerns regarding Mother's inability to feed

the child properly, among other issues, that had been documented with J.J.'s older half sibling.

The report also noted that Father was refusing to participate in pre-disposition services, that he informed the social worker on August 12, 2021, that he was no longer living with Mother but refused to answer the social worker's questions and screamed throughout the phone call. On that date, Mother reported that she had moved into a new home a month earlier but refused to provide the address to the social worker.

On November 16, 2021, the court held the further jurisdiction and disposition hearing, found Father to be J.J.'s presumed father, found all the allegations in the first amended petition true, declared J.J. a dependent child of the court, ordered her removed from the physical custody of both parents, and ordered reunification services for Father. Mother's counsel argued that Mother had made a reasonable effort to address the problems that led to the removal of J.J.'s half siblings and the termination of Mother's parental rights. The court found that the evidence showed Mother continuing to exhibit the same problems in being unable to meet the child's basic needs that she had with J.J.'s half siblings, that Mother was still denying her parental rights had been terminated, and was refusing to cooperate with the Department, for instance refusing to provide her address to the social worker. The court denied reunification services for Mother under section 361.5, subdivisions (b)(10) and (b)(11), maintained weekly supervised visitation, and set a status review hearing for May 16, 2022.

D.     SIX-MONTH STATUS REVIEW

The Department's status review report filed May 12, 2022, noted that J.J. was doing well in her current placement where she had been since July 2021, the current caregiver was meeting her needs and had expressed interest in adoption in the event Father failed to reunify.  Father had completed his domestic violence program, his attendance in individual counseling was " 'somewhat erratic,' " he failed to participate and complete family education, and reported that he was homeless and unemployed.  The report again noted problems during the parents' visits with J.J.  Mother had to be redirected to put away her phone as she " 'was always calling friends and family to FaceTime' " during visits.  Mother tried to feed the baby Vienna sausage during one visit and had to be stopped because it posed a choking hazard to the baby.  It was observed that Father has to remind Mother during visits of things she had previously been warned against, which leads to them bickering with each other, so separate visits for each parent had to be arranged.  Father continued to exhibit angry and impulsive behavior, using expletives and hanging up on a social worker.  The Department recommended that Father's reunification services be terminated, and a section 366.26 hearing be set to establish a permanent plan of adoption for J.J.

The six-month status review hearing was continued to June 7, 2022, because Mother's guardian ad litem was unavailable.  At the June 7 hearing, the court terminated Father's reunification services and set a section 366.26 hearing for October 5, 2022.

9

### E. MOTHER'S SECTION 388 PETITION

Mother filed a section 388 petition on September 14, 2022, requesting that the court return J.J. to Mother's custody under a family maintenance plan, order an extended visit, or, in the alternative, that family reunification services be granted to Mother. The petition stated that Mother had completed parenting and domestic violence programs and was seeing a psychiatrist. The petition stated that the requested order would be in the child's best interest because Mother had "completed services, acknowledged her issues, and visits consistently." Attached to the petition were certificates of completion for a program for domestic violence victims and a nurturing parenting program as well as a business card and appointment card showing that Mother had a September 20 appointment scheduled with a psychiatric nurse practitioner.

On September 15, 2022, the court denied Mother's petition because it failed to state a change of circumstances and does not promote the best interest of the child. The court's order explained: "At best, mother demonstrates changing circumstances, mother has not provided any progress reports to show she benefitted from services. Mother does not address what services she has participated in to overcome her learning disability that hinders her ability to care for the child. Additionally, it was reported in the 5-16-2022 status review report that parents were always bickering with each other so visits were separated." On September 29, 2022, Mother filed a notice of appeal from the court's denial of her section 388 petition.

10

F.    SECTION 366.26 HEARING

On September 20, 2022, the Department filed a section 366.26 report recommending that parental rights be terminated, and a permanent plan of adoption be implemented. The report noted that J.J. shared a mutual bond and attachment with her caregiver and prospective adoptive parent with whom she had been placed since July 13, 2021, when she was six weeks old. J.J. was having all of her needs met, had gained weight, was healthy, and had been found eligible for early start regional center services due to a 25 percent delay in the area of fine motor skills. The caregiver appeared to be dedicated to J.J. and committed to raising her to adulthood.

On October 5, 2022, the juvenile court held the section 366.26 hearing. Mother's counsel objected to the Department's recommendation to terminate Mother's parental rights, offered no affirmative evidence, and declined the court's offer to set the matter for contest so Mother could testify. Mother's counsel read the following statement from Mother to the court: " 'I know I made a mistake, but I learned from my mistake. I'm trying to be a better mom and a better person. I'm not saying that I'm perfect, I'm not saying that I'm better than anyone, but I'd like a second chance in being a mom. I just want to be in my baby's life. I did everything without the courts telling me to do it. I learned a lot from my classes.' " The juvenile court set adoption as the permanent plan, found by clear and convincing evidence that J.J. was generally and specifically adoptable, found the beneficial parental relationship exception did not apply, terminated parental rights, and set a post-permanency review hearing for April 5, 2023. On that same date,

11

Mother filed a notice of appeal from the juvenile court's order terminating her parental rights.

## DISCUSSION

### A.     APPELLATE JURISDICTION

Relying on this court's decision in *In re J.F.* (2019) 39 Cal.App.5th 70 (*J.F.*), the Department argues that we lack jurisdiction to consider Mother's appeal from the September 15, 2022, order denying her section 388 petition because Mother's notice of appeal filed on October 5, 2022, designated only that day's order terminating her parental rights as the order being appealed.  The Department, however, overlooks that Mother also filed a separate notice of appeal on September 29, 2022, from the juvenile court's denial of her section 388 petition.  We accordingly have appellate jurisdiction to review both orders.  (Cal. Rules of Court, rules 8.100(a)(2), 8.405(a)(3).)

### B.     SECTION 388 PETITION

Mother contends that the juvenile court abused its discretion by denying her section 388 petition without an evidentiary hearing because she had demonstrated her circumstances had changed and that it was in the children's best interest to be provided with services.  She claims that she had made the requisite prima facie showing, and the court violated her due process rights by not affording her a hearing.  She also claims the court erred by basing its denial in part on Mother's learning disability.  We disagree.

12

"Under section 388, a parent may petition to change or set aside a prior order 'upon grounds of change of circumstance or new evidence.' [Citations.] The juvenile court shall order a hearing where 'it appears that the best interests of the child . . . may be promoted . . .' by the new order. [Citation.] Thus, the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157, fn. omitted (*G.B.*).) "A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*Ibid.*)

We review the juvenile court's denial of Mother's section 388 petition without an evidentiary hearing for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317-318 (*Stephanie M.*).) The denial must be upheld unless we can determine from the record that the juvenile court's decision exceeded the bounds of reason "by making an arbitrary, capricious or patently absurd determination." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *Stephanie M.*, at p. 318.) When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

" 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' " (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 418.) Consequently, section 388 petitions with general, conclusory allegations do not suffice. Otherwise, the "decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593 (*Edward H.*).) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

After reunification services are terminated, the focus in dependency proceedings shifts from family reunification to the child's need for permanency and stability. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *G.B.*, *supra*, 227 Cal.App.4th at p. 1163.) A court entertaining a section 388 petition at this stage in the proceedings "must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317.)

We conclude that the juvenile court did not abuse its discretion in denying Mother's section 388 petition without an evidentiary hearing. In her petition, Mother alleged that her circumstances had changed because she had completed some of the pre-disposition services she had been referred to, including a parenting class and domestic violence program, and she had an upcoming appointment with a psychiatric nurse practitioner. This does not show changed circumstances, only that her circumstances

14

were changing. Moreover, while Mother had completed a parenting class in February 2022, the status review report filed three months later noted that during visits Mother continued to exhibit an inability to safely feed J.J.—the very same problem that had been documented by the Department with Mother's previous children since 2004. In addition, Mother spent the visiting time on her phone talking to friends and family and had to be redirected to focus her attention on J.J. Furthermore, Father frequently had to prompt Mother to remind her of things she was previously warned against, which led to them bickering to the point that their visits had to be separated.

"Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citation.] The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order. [Citation.]" (*Ibid.*)

Mother did not explain in her section 388 petition how she benefitted from the services that she completed, in other words, how these services related to her ability to provide safe and appropriate care for J.J. On the contrary, Mother's continuing inappropriate behavior during visits established that the problems that brought J.J. into the dependency system clearly had not been eliminated. Mother had therefore failed to establish a change in circumstances that would warrant granting her section 388 petition.

15

Furthermore, Mother did not establish that the requested change of order would be in J.J.'s best interest. "At the point of these proceedings—on the eve of the section 366.26 permanency planning hearing—the children's interest in stability was the court's foremost concern and outweighed any interest in reunification. [Citation.]" (*Edward H.*, *supra*, 43 Cal.App.4th at p. 594.) "[A]fter reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) Mother's request to have J.J. returned to her custody with family maintenance services would undermine J.J.'s interest in stability and permanency. J.J. had been in a stable, loving home where she had bonded with her caregiver who had met all of her needs since she was just six weeks old, and who wanted to adopt her. Putting that on hold in order to allow Mother six months of reunification services to see if she could do what she was required to do to regain custody would not have promoted stability for J.J., and thus would not have promoted the J.J.'s best interest. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

Finally, Mother claims her due process rights were violated by the juvenile court's decision which denied her fair and meaningful access to the court simply because she had a learning disability. We disagree. In denying the petition, the juvenile court focused not on Mother's learning disability, but rather on her inability to care for J.J. Specifically, the court noted that Mother's petition had failed to address how she benefitted from

16

services to help her "overcome her learning disability *that hinders her ability to care for the child*." (Italics added.) The primary concern that brought J.J. into the dependency system was Mother's demonstrated inability to properly follow care instructions to safely meet J.J.'s most basic needs, such as feeding, without extensive and ongoing assistance and guidance. The juvenile court properly focused on the fact that Mother's petition did not address how the services that she completed would ameliorate this concern. Because the evidence showed Mother continued to endanger J.J., for example by attempting to feed her a Vienna sausage without realizing it was a choking hazard to an infant, the court found that Mother's circumstances had not changed. Thus, the court based its denial of Mother's petition on Mother's failure to address her difficulties providing care for her daughter, not on Mother's learning disability.

In sum, the juvenile court properly summarily denied Mother's section 388 petition.

## C.     TERMINATION OF PARENTAL RIGHTS

Although Mother filed a notice of appeal from the juvenile court's order terminating her parental rights as to J.J., Mother provides no argument whatsoever on the subject. Mother has accordingly forfeited any claim of error regarding the termination of her parental rights, and we therefore affirm the order. (*J.F.*, *supra*, 39 Cal.App.5th at pp. 79-80.)

17

**DISPOSITION**

The juvenile court orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.

18