Filed 8/28/24  In re J.G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | B332869, B333964 (Los Angeles County Super. Ct. No. 20CCJP04967A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.A. et al.,<br><br>        Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant S.A.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant Leonard G.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellants S.A. (mother) and Leonard G. (father) appeal from the juvenile court's orders (1) denying mother's Welfare and Institutions Code section 388[1] petition to reinstate reunification services and (2) terminating parental rights to their son, J.G. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Referral and petition**

On September 17, 2020, the Los Angeles County Department of Children and Family Services (department) received a referral alleging mother had severely neglected five-year-old J.G. (born May 2015). Mother was arrested for driving under the influence of alcohol (DUI) after being observed driving over 100 mph and weaving in and out of traffic at approximately 2:39 a.m. Mother's blood alcohol level was 0.14 percent. During the arrest, mother was uncooperative, yelling, screaming, and expressing a desire to kill herself. J.G. was in the backseat, unrestrained by a seatbelt or car seat.

Mother has a history of substance abuse and prior DUI arrests. Her criminal history includes a January 1, 2016 DUI

---

[1] All further unattributed statutory references are to the Welfare and Institutions Code.

2

conviction, an August 24, 2019 DUI arrest, and a September 17, 2020 DUI arrest. Mother had previously received voluntary family maintenance services in 2016 related to her alcohol use.

On September 21, 2020, the department filed a petition alleging J.G. came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) based on Mother's substance abuse and the September 17 incident. The juvenile court detained J.G. from parental custody on September 24, 2020.

The petition was amended to add allegations that father's untreated mental health issues and his failure to comply with court orders endangered J.G. After mother tested positive for cocaine, the petition again was amended to add claims of mother's substance abuse.

The juvenile court sustained the second amended petition on December 11, 2020, finding true the allegations mother had placed J.G. in a detrimental and endangering situation by driving under the influence with the child in the car and mother had a history of substance abuse and was a current abuser of alcohol and cocaine. The court also found true the allegations that father's mental health issues and failure to comply with court orders endangered J.G.

Reunification services for mother were ordered, including substance abuse treatment, random drug testing, and parenting education. The court did not order reunification services for father.

**Reunification services**

Over the next two years, mother participated in court-ordered services. She struggled to maintain consistent sobriety, exhibiting behaviors associated with those struggling with addiction, e.g., minimizing, blaming, not taking accountability, and lacking a commitment to testing. On March 16, 2021, mother

was again arrested for DUI after causing a collision while driving with a suspended license. Her blood alcohol levels were measured to be 0.17 percent and 0.15 percent.

J.G. exhibited behavioral issues throughout the dependency proceedings, including aggression, sexualized behaviors, and regression. He was diagnosed with posttraumatic stress disorder and attention deficit hyperactivity disorder. J.G.'s behaviors often worsened during and after visits with mother. J.G. would call his mother stupid and ugly and the caregiver had to end one virtual visit to stop J.G. from hurting his face. After other visits with mother, J.G. made comments about dying and having to smoke to feel better. J.G.'s behavior was observed to be sexualized, including telling stories about sexual behavior and engaging in shaking his bottom with his hands. When asked where he had seen this, he said "sometimes when he is sitting down on the couch Mama sits on his lap and shakes her booty."[2]

Mother's visits with J.G. were initially monitored. In October 2021, they were liberalized to unmonitored. However, mother struggled to manage J.G.'s behaviors during visits and often completed his homework for him rather than helping him do the work. Mother promised J.G. he would return to her care, and she asked him to conceal the fact she was violating restrictions on her driving privilege. In April 2022, mother's

---

[2]  The department's report expressed a concern J.G. was exposed to sexualized content while in his mother's care. J.G. described specific details of sexual behavior involving his mother and her partners. In addition, video equipment, cameras, and lighting were observed in mother's bedroom along with red satin sheets on her bed.

visits reverted to monitored after the department filed a section 388 petition based on these concerns.

At the July 25, 2022 18-month review hearing, the juvenile court found mother had partially complied with her case plan but had not gained sufficient insight to warrant returning J.G. to her care. The court granted mother additional reunification services.

On August 12, 2022, J.G. was placed with Ms. F., who expressed a desire to adopt him. J.G. thrived in Ms. F.'s care, developing a strong bond with her and referring to her as "Nana."

At the 24-month review hearing on October 27, 2022, the juvenile court terminated reunification services and set a section 366.26 permanency hearing. The court found while mother was in compliance with her case plan, it had not been completed. The court noted mother's history of relapse, additional DUI arrests, positive drug tests, and failure to gain insight into her behavior.

Mother filed a section 388 petition seeking to regain custody of J.G. or reinstate reunification services. Mother alleged changed circumstances based on her completion of court-ordered programs, participation in Alcoholics Anonymous, negative drug tests, and employment. The juvenile court denied the petition on October 26, 2023, finding mother had not demonstrated the proposed change would be in J.G.'s best interests.

**Permanency hearing**

At the permanency hearing, mother testified she helped J.G. with homework and played cards with him during visits. She added he would smile, hug her, and call her mommy during the visits. Mother also stated she does not attend his medical appointments or therapy, explaining the department does not allow her to attend. She could not identify the name of his school or teacher and admitted she does not discipline J.G. Father did not appear.

The juvenile court terminated parental rights, finding J.G. adoptable and that no exception to adoption applied. The court found mother and father failed to demonstrate a beneficial parental relationship that outweighed the benefits of adoption.

Mother and father appealed the October 26, 2023, orders denying the section 388 petition and terminating parental rights.[3]

## DISCUSSION

### I. No abuse of discretion in denying mother's section 388 petition

Mother contends the juvenile court erred in denying her section 388 petition to reinstate reunification services. We disagree because, though mother made commendable changes to address her substance abuse issues, she did not establish it was in J.G.'s best interests to reinstate services for the purpose of reunifying the family at some uncertain future date.

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. [Citation.] 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.'" (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence. [Citation.] We may disturb the exercise of

_____

[3] Mother's notice of appeal was assigned case No. B332869 and father's was assigned No. B333964. On March 28, 2024, this court granted a request to consolidate the appeals.

the court's discretion only when the court has made an unreasonable or arbitrary determination." (*Id.* at p. 846.)

In her section 388 petition mother sought to reinstate reunification services that were terminated after two years of services having been provided to mother.

When considering her petition, the juvenile court found mother demonstrated the existence of changed circumstances by addressing the reasons for terminating services. This was based on her completing an 18-month DUI program, her use of support groups to assist with alcohol sobriety, and her negative drug test results. However, mother was also required to show it was in J.G.'s best interests to reinstate the reunification efforts.

"[A]fter reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) It is not in the best interests of the child to further delay permanency and stability in favor of rewarding the parent for hard work and efforts to reunify. (*Ibid.*) The parent's best interests "are simply no longer the focus." (*Ibid.*)

The California Supreme Court recently reaffirmed that "to promote the prompt resolution of the child's custody status and her permanent and stable placement, the law sets a presumptive 18-month limit on reunification services." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627.)[4] This time limit "reflects a considered legislative choice: '[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must

---

[4] Under some limited circumstances, services may be extended for an additional six months. (*Michael G. v. Superior Court, supra*, 14 Cal.5th at pp. 628-629.)

be a limitation on the length of time a child has to wait for a parent to become adequate.'" (*Ibid.*)

Here, mother had already received more than the presumptive limit of reunification services and failed to show it was in J.G.'s best interests to delay permanency and stability and extend the uncertainty of foster care. Weighing strongly against delaying permanency was mother's prior years of substance abuse. Mother began drinking alcohol when she was 14 years old and had been arrested repeatedly for DUI's, including the September 2020 DUI that resulted in J.G.'s detention and another DUI occurring during its pendency. Also during the pendency of this case mother tested positive for cocaine. Even if mother had made commendable progress in treating her substance abuse in the year before her petition, this must be considered in the context of the prior years of substance abuse.

Further, the record shows J.G. had been thriving in the stability of the placement with his prospective adoptive mother, to whom he was securely attached and with whom he desired to stay. J.G.'s improvement occurred over the nearly three years since he had been detained from mother's care.

Delaying permanency to provide mother with further reunification services "would deprive [J.G.] of a permanent, stable home in exchange for an uncertain future." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 225.) It was reasonable for the juvenile court to find it was not in J.G.'s best interests to reinstate family reunification services and deprive him of a permanent, stable home.

Thus, there was no abuse of discretion in the juvenile court's order denying mother's section 388 petition.

**II. No error in finding the parental-benefit exception inapplicable**

Mother and father contend the juvenile court erred in terminating their parental rights because the parental-benefit exception applies. However, mother does not address the substantial evidence supporting the trial court's finding on the parental-benefit exception. Father fails to show error in the record and merely contends if we agree with mother, his parental rights should be reinstated.

Under section 366.26, once the juvenile court terminates reunification services and determines a dependent child is adoptable, it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several statutory exceptions. (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).) To establish the parental-benefit exception, a parent must show: (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Id.* at p. 636.) We review the juvenile court's factual findings regarding the existence of a beneficial parental relationship for substantial evidence and its determination that termination of parental rights would not be detrimental to the child for abuse of discretion. (*Id.* at pp. 639-640.)

**A. *Substantial evidence supports the finding that the beneficial relationship exception was not applicable***

The department admits mother established the first element by showing she maintained regular visitation and

9

contact with J.G. As to the second element, "courts assess whether 'the child would benefit from continuing the relationship.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) The focus is on the child, and factors that are considered are "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.*)

Here, J.G. was detained from mother on September 17, 2020, when he was five years old. In the nearly four years since, the record does not demonstrate mother consistently provided emotional support or engaged in positive, nurturing interactions with J.G. Instead, during visits, J.G. was rude to mother, called her "stupid," and was observed to act as if he were spitting or urinating on mother during virtual visits.

There was no showing that mother actively participates in J.G.'s learning and development by offering guidance, teaching life skills, and encouraging his growth. On the contrary, mother does not even know the name of the school J.G. attends or his teacher. She admitted she does not attend his therapy, claiming the department does not allow her to participate. She also admitted she does not discipline J.G. On occasion she appeared intoxicated during calls and encouraged J.G. to dance by singing "there's some hoes in this house." When J.G. engaged in sexual behavior inappropriate for his six years of age and was asked where he learned the behavior, he explained, "sometimes when he is sitting down on the couch Mama sits on his lap and shakes her booty."

Though mother testified she and J.G. have visits where she helps him with his homework and they play cards,such routine interactions fall short of demonstrating J.G. looks to mother for reassurance and comfort or that she is attentive to his special

needs. Thus, substantial evidence supports the implicit finding mother did not establish the second element, i.e., that she had a substantial, positive bond with J.G.

As to the third element, the detriment J.G. will suffer from terminating the parental relationship, mother offered no evidence that outweighs the benefit of a stable, nurturing new home. There is no evidence J.G. suffers significant distress or depression when leaving mother. Instead, it shows J.G. "happily trotting off back to [caregiver's] vehicle without any upset from leaving his mother." There is no evidence J.G. has a connection with mother or that she plays a key role in his sense of self such that he will suffer a detriment at the loss of the parental relationship. Moreover, the record shows J.G. thrives in his new home. He is bonded with his caregiver and calls her "Nana," has a loving relationship with another child in the home, who he refers to as sister, and encourages new foster children placed in the home to share and listen to the caregiver.

The record supports the juvenile court's conclusion that any detriment from severing the attachment with mother was outweighed by the benefits of adoption. Given a child's need for permanence and stability, the court did not abuse its discretion in finding termination of mother's parental rights would not be detrimental to J.G.

### B.   *Father fails to identify any error and did not establish the beneficial relationship exception*

Father joins mother's arguments and offers no independent basis to find error. Essentially it is his argument that, if the order terminating mother's parental rights is reversed, his rights should be reinstated as well. Since mother did not demonstrate error, father has no basis for reversal.

11

Further, the record contains no evidence of a significant, positive relationship between father and J.G. Father did not establish he had consistent visitation and contact throughout the dependency proceedings. Mother reported father had not seen J.G. since 2016 and that J.G. knew a different man as his father. When father participated in an in-person visit, J.G. initially hid behind the visitation supervisor and said, "that is not my dad." In a telephone visit, J.G. did not recognize father and eventually asked to end the call. Father's visits were inconsistent and there is no evidence he had a positive, beneficial relationship with J.G. or that terminating the relationship would cause detriment to J.G.

Thus, the juvenile court's finding that father failed to establish the parental benefit exception was clearly supported by substantial evidence.

## DISPOSITION

The orders of the juvenile court are affirmed.

_____
CHAVEZ, J.

We concur:

_____
LUI, P. J.

_____
ASHMANN-GERST, J.