Filed 9/30/24  In re A.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B334413 (Los Angeles County Super. Ct. No. 20LJJP00532A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.M.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Donald A. Buddle, Jr., Judge. Affirmed in part and conditionally reversed in part with directions.

Lori N. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah J. Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, S.M. (mother) seeks reversal of the juvenile court's January 9, 2024 order terminating parental rights to her young daughter A.S. (daughter). Mother makes four arguments on appeal. First, mother argues the juvenile court erred when it summarily denied her Welfare and Institutions Code section 388 petition, through which mother sought to reinstate reunification services.[1] Second, mother argues the juvenile court erred when it denied her requests to have her mother (maternal grandmother) assessed as a relative placement for daughter under section 361.3. Third, mother argues the court should not have terminated her parental rights because the beneficial parental relationship exception to adoption applied here. Finally, mother argues the order terminating parental rights must be reversed because the juvenile court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law (Cal-ICWA).

We agree with mother that the juvenile court and the Department failed to comply with the required initial duty of inquiry under Cal-ICWA. Accordingly, and in light of our

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

Supreme Court's recent decision in *In re Dezi C.* (2024) 16 Cal.5th 1112 (*Dezi C.*), we conditionally reverse the order terminating parental rights and remand with directions so that the juvenile court can ensure compliance with Cal-ICWA. In all other respects, we affirm the juvenile court's January 9, 2024 order.

## BACKGROUND

### 1. The Family

Prior to the initiation of the proceedings below, mother and daughter lived with maternal grandmother and other maternal relatives. Daughter had developmental delays and, during the underlying proceedings, was diagnosed with autism.

Mother did not know who daughter's father was. L.S. was mother's ex-boyfriend and initially was named as "father" in the underlying section 300 petition. L.S. believed he was daughter's father, but was unsure. Sometimes mother said he was and sometimes she said he was not. A family law custody order granted joint custody of daughter to mother and L.S. However, mother did not abide by that order.

Mother and L.S. had a contentious and "toxic" relationship, including domestic violence. They each made serious accusations, often unsubstantiated or false, against the other (e.g., physical and sexual abuse, drug use, threatened violence) and harassed each other on social media. Although at various times criminal protective orders protected mother, maternal grandmother, a maternal uncle, and daughter from L.S., they did not always comply with those orders. For some time, maternal grandmother allowed L.S. to live in her home with mother in violation of a restraining order. An adaptive learning skills instructor who had worked with L.S. for two years said L.S. was

3

diagnosed with "Mild Intellectual Disability" and was " 'not a bad person.' "

Initially in the proceedings below, L.S. was considered daughter's presumed or alleged father. In late-2020, however, after having taken a paternity test, it was determined L.S. was not daughter's biological father and the juvenile court made a non-paternity finding as to him.

In addition to L.S., mother provided names of two other possible fathers. One, N.A., submitted to a paternity test, which indicated he was not daughter's biological father. The juvenile court made non-paternity findings as to N.A. The other, A.P., did not believe he was daughter's father and mother told him he was not the father. Neither he nor his family members wanted to be involved in the proceedings below. The juvenile court ordered no reunification services for him.

## 2. Detention, Petition and Adjudication

In August 2020, when daughter was 18 months old, she was removed from mother and L.S. and placed in the foster home of Mr. and Mrs. M. The Department filed a section 300 petition on behalf of daughter (petition). Prior to adjudication, mother enrolled in a parenting class and visited with daughter consistently, either on-line or in person. Mother called the foster parents at all hours and complained about their care of daughter, making them uncomfortable and reluctant to communicate with mother. In September 2020, during a Department interview, maternal grandmother expressed interest in daughter being in her home and mother moving out.

In December 2020, after mother previously had signed a waiver of rights and pleaded no contest to the petition, the juvenile court sustained allegations that mother and L.S. had a

history of violent altercations in daughter's presence, continued to threaten each other, failed to abide by criminal protective orders and restraining orders, and mother failed to protect daughter. The court declared daughter a dependent of the court, removed her from mother and any alleged father, and ordered family reunification services. The court ordered mother, among other things, to participate in a domestic violence program, drug testing (and, if any test was missed or positive, a substance abuse program), a parenting program, and individual counseling. The court granted mother monitored visits with daughter.

### 3.    Reunification Period

#### a.    Mother

In November 2020, mother completed a parenting program. Mother stated she had enrolled in a domestic violence class as well as individual counseling. However, the Department was unable to verify her participation in either. Additionally, mother consistently failed to appear for drug tests and, as a result, the Department advised her she needed to enroll in a substance abuse program. At the time, mother and a maternal aunt were living in maternal grandmother's home.

In November 2021, mother stated she had moved out of maternal grandmother's home for some time, but again was living with maternal grandmother and other maternal relatives. Mother still failed to show for her drug tests. A Department social worker advised mother her reunification services could be terminated due to her lack of cooperation. Mother admitted she had not enrolled in court-ordered programs. She explained, "she knows [daughter] should be enough motivation, but she is depressed and sometimes her daughter is not enough motivation." Mother said she did not want to get out of bed and

had suicidal ideations. She noted she "does smoke weed, but not excessively" and had "been drinking heavily since she turned 18," saying she drank " 'hard liquor.' " Nonetheless, mother stated she was " 'ready to parent.' "

### b. Daughter

During the reunification period, daughter remained in the foster home of Mr. and Mrs. M., who were interested in adoption or legal guardianship. The Department reported daughter had "flourished in the structure and consistency of the foster home." Daughter showed "growth in her motor skills, development and her speech since placement in the home." In November 2021, Daughter's therapist stated the foster parent Mrs. M. was "a major asset to helping [daughter] improve." The therapist tried to contact mother about psychological testing for daughter, but mother did not return the therapist's telephone calls. Daughter enrolled in services with the Regional Center.

### c. Visits

In May 2021, the Department reported mother's parenting skills were improving and her visits with daughter were appropriate. Mrs. M., maternal grandmother, and a maternal aunt served as monitors for mother's visits with daughter, which occurred at a park or at maternal grandmother's home. A Department social worker who observed visits between mother and daughter believed daughter had "developed a strong bond with the mother." The social worker described a "delightful little ritual" between mother and daughter at the end of visits that included a "hug, high five and then fist bump."

In November 2021, the social worker again reported visits went well, mother and daughter hugged and kissed each other during visits, and had "long embraces at the end of each visit."

However, the Department was "unable to liberalize because [mother] has not provided any information as to her progress on her Court orders, and continues to be a no show for Drug and Alcohol testing."

**4.     Permanency Planning and Review Period**

By late-November 2021, the Department recommended terminating reunification services. Daughter's counsel supported the Department's position. At a January 19, 2022 hearing, however, counsel for mother urged the juvenile court to return daughter to mother's care and to continue reunification services. Mother's counsel also requested, for the first time, that maternal grandmother be assessed for placement. The Department argued there was no need to assess anyone at that time because daughter was doing well in her placement with Mr. and Mrs. M. Counsel for the Department stated, "If and when a new placement becomes necessary, then the Department, of course, will reassess the maternal grandmother." The juvenile court agreed with the Department and denied without prejudice mother's request to assess maternal grandmother for placement.

At that same January 19, 2022 hearing, the juvenile court terminated mother's reunification services and set the matter for a permanency planning hearing. Mother filed a notice of intent to file writ petition challenging the day's orders. After review, however, mother's attorney found no viable issues for review and, therefore, notified mother and the court that she would not file a writ petition under California Rules of Court, rule 8.452. Mother did not file a writ petition in propria persona. Accordingly, this court dismissed the matter. (*S.M. v. Superior Court* (Apr. 28, 2022, B318072).)

7

In mid-2022, the Department reported daughter continued to do well in the home of foster parents Mr. and Mrs. M. A Department social worker reported daughter "appears comfortable and happy with the prospective adoptive parents and naturally seeks comfort from them" and tells them "I love you." However, Mrs. M. reported that, as daughter grew older, visits with mother began to have a "negative impact on the child's behavior in the home" and at her daycare. After some visits, daughter feared the bathtub and screamed when Mrs. M. tried to bathe her or wash her hair. After one visit, daughter exposed herself to a father of another child at daycare. Another time, daughter "spread her feces all over a crib and walls in a room" at daycare. Daughter underwent a child abuse consultation and forensic medical exam because foster mother reported daughter fondled herself and exposed herself to adult males. The examination could neither confirm nor exclude sexual abuse.

At a July 2022 permanency planning hearing, counsel for mother made an oral motion that daughter be placed with maternal grandmother. Counsel for the Department noted, "[W]e are post-termination of family reunification services with the recommendation of adoption with the current caregivers. Any request to change the minor's placement at this time would not be appropriate, especially without a 388 filing." The juvenile court denied the motion for the reasons stated by the Department.

In January 2023, the Department reported foster mother Mrs. M. had stated, " 'I need the visits to stop because they are affecting [daughter's] behavior.' " In the same report, the Department noted at visits, daughter was "excited to see her mother by smiling and laughing when her mother approaches the

car to remove[] her from her car seat.  After visits [daughter] puts her head down in a sad motion and pouts.  [Daughter] is very connected to both her mother and grandmother."

Although Mr. and Mrs. M. consistently expressed their desire to adopt daughter, over time the Department developed concerns about their ability to do so.  In January 2023, the Department requested "additional time to address the concerns as to [Mr. M.'s] referral history, obtain the clearances for [a] new adult [in the foster home] and address the concerns as to the caregiver's parenting skills."  It was noted foster mother Mrs. M. may have taken on too much as she was her adult-son's part-time caretaker, had four dependent children, including daughter, in her care, and was caring for her mother-in-law who had dementia.  Also, a few people familiar with the family observed a lack of a bond between Mrs. M. and daughter.

On June 9, 2023, after almost three years with Mr. and Mrs. M., the juvenile court ordered daughter removed from their home due to safety concerns.  The court also modified mother's visits and ordered that they take place at a Department-approved or neutral location, with a social worker or "HSA" present, and no unapproved people present.  The Department was ordered to assess monitors proposed by mother and to assess maternal grandmother's home for visits.  At that hearing, mother also made an oral request that maternal grandmother be assessed for placement.  Counsel for mother stated, "At this time, we are just asking for the assessment to determine whether or not it would be appropriate to have [daughter] released to [maternal grandmother's] home, pending the results of the investigation" into the concerns necessitating daughter's removal from Mr. and Mrs. M.'s home.  Mother also had filed a relative information

sheet, listing maternal grandmother and a maternal uncle who lived with maternal grandmother. Given the concerns still being investigated, however, the juvenile court did not place daughter with maternal grandmother or with any relative.

Instead, daughter was placed with a different foster parent, Ms. Z., who previously worked at a home for the mentally challenged and had experience fostering children and working with autistic children. Ms. Z. said daughter "fit right in since arriving to the home" and soon began calling Ms. Z. "mommy." Mother's monitored visits with daughter continued and took place at a Department office. In July 2023, a Department social worker reported daughter was "happy during the visit, constantly hugging and kissing her mother." However, the social worker also reported daughter "regress[ed] in her development when visiting with the mother, reverting to acting younger, not using her speech to request what she wants such as a juice cup or toy, she constantly reaches for her mother to hold her, and crying more than usual."

In September 2023, a Department social worker reported daughter had formed a bond with Ms. Z., calling her "mom," initiating hugs, saying "I love you," and stating she wanted to stay with Ms. Z. "until she is a big person." According to Ms. Z., daughter had "made amazing progress at home," "was potty-trained in a matter of a few days," and had "developed a sisterly bond with the caregiver's younger children." Ms. Z. said she had worked with autistic children with "more difficult needs than [daughter]." Ms. Z. was working with a therapist to address daughter's "intense fear of showers." Ms. Z. said she had formed a strong bond with daughter, loved her "deeply," and wanted to

adopt her.  Ms. Z. felt "it was meant to be that [daughter] came to her home."

Around the same time, and as the court previously had ordered, the Department assessed maternal grandmother as a potential monitor and her home as a location for visits.  The Department found the home "neat and clean with no safety concerns noted."  The Department concluded maternal grandmother's home was "appropriate for visitation at this time."  In September 2023, the juvenile court authorized monitored visits for mother and daughter in maternal grandmother's home only.  The court ordered mother's contact with anyone in the home must be monitored, and visits in any other location had to be approved in advance by the Department.

In November and December 2023, the Department reported daughter's adoption by Ms. Z. had been approved.  The Department recommended that the juvenile court terminate parental rights.

At a November 17, 2023 hearing, counsel for mother renewed her request that maternal grandmother be assessed for placement.  The Department objected to the request, stating it "is ready to terminate parental rights" and daughter had been in her new placement, which was "adoption ready," for several months.  The juvenile court denied mother's request.

In early January 2024, a Department social worker spoke with daughter's therapist, who "did not believe that the visits with the mother are healthy for [daughter] as there is strong regression during the sessions after the visits occur."  She explained, daughter " 'regresses to becoming nonverbal after visitations, using the restroom on herself, and constant crying.' "  The therapist did not believe daughter had "a connection with the

mother after the visits." According to the therapist, daughter could not answer questions about visits with mother other than to say what food she ate. The social worker also spoke with Ms. Z., who reported mother "continually harasses" her after visits "about [daughter's] hair care, diet, and several other issues, that are not true." Ms. Z. "tried to be patient with the mother, but the mother continues to aide in [daughter's] behavior regressing to that of an infant." The social worker reiterated that, during visits with mother, daughter was happy but her behavior regressed. Mother's visits were consistent and monitored.

5.      **Mother's Section 388 Petition and Termination of Parental Rights**

The permanency planning hearing originally was scheduled for May 2022. However, the hearing was continued several times for a variety of reasons. Ultimately, it was held close to two years later, on January 9, 2024.

The day before the permanency planning hearing, mother filed a section 388 petition, asking the court to order "Reinstatment of reunification services." Mother stated she had enrolled in a treatment program "to complete the remaining components of my case plan as well as to make up for my missed testing." She "expect[ed] to complete treatment February 2024." Mother believed the requested order was best for daughter because mother "visit[s] consistently and ha[s] a bond with my daughter." Mother attached an enrollment letter from the treatment program, which stated mother had enrolled in a "Day Treatment/Outpatient/Residential Substance Abuse Program" in October 2023.

At the January 9, 2024 permanency planning hearing, the juvenile court first addressed mother's section 388 petition.

12

Counsel for mother requested the court either continue the hearing, so the Department could "properly and fully address mother's 388 and for a report," or grant the section 388 petition. Counsel for daughter and for the Department both urged the court to deny the section 388 petition. Finding no changed circumstances and that the section 388 petition was not in daughter's best interest, the juvenile court denied the 388 petition without a hearing.

The court then turned to the permanency planning hearing. At the start of the hearing, mother's attorney renewed mother's request that daughter be placed with maternal grandmother. Counsel noted maternal grandmother had moved into a larger apartment. The juvenile court ruled, "Considering the timing, the request is denied."

Mother testified. She said she visited with daughter two days a week for three to four hours each time. Maternal grandmother monitored the visits and interacted with daughter. Mother stated during visits she made food for daughter, played with her, and taught her age appropriate things. Mother also said she learned daughter was autistic from a Department report she received in the mail. After that, mother researched autism to learn more. Mother testified she had never met daughter's therapist. Mother did not agree with the therapist's report that daughter regressed after visits. Mother described daughter as happy and eager to see her.

Mother's counsel argued mother qualified for the beneficial parental relationship exception to adoption and, therefore, the juvenile court should not terminate mother's parental rights. Counsel urged the court not to put too much weight on the therapist's statement that daughter regressed after visits.

13

Mother's counsel noted the therapist had never attended one of mother's visits with daughter and it was speculative to try to determine why daughter regressed. Counsel believed mother had "demonstrated a significant parent-child bond that the court should not terminate."

Counsel for daughter and for the Department agreed mother had shown consistent and regular contact with daughter but, nonetheless, urged the court to terminate parental rights. Daughter's attorney did not believe mother had shown a substantial and emotional attachment with daughter, noting daughter was a happy child, whether with mother or with others. Daughter had formed a quick and strong bond with Ms. Z., which had greatly benefitted daughter. Counsel for the Department argued Ms. Z. filled the parental role, which included handling daughter's difficult behaviors, while mother acted more like a close family friend, who enjoyed happy play dates with daughter.

The court held it was likely daughter would be adopted and no exceptions to adoption applied. The court found mother had maintained consistent visitation with daughter but had not formed the necessary bond with her. Noting daughter's therapist was a non-interested party, the court gave more weight to the therapist's assessment of "the effects of mother's visits with [daughter]" than to mother's assessment. In addition, the court explained Ms. Z. corroborated the therapist's reports that visits had a negative effect on daughter. Finally, the court noted, "There is no evidence that when [daughter] is reverting that she is requesting to visit mother or any evidence that there is a request to visit mother at all. It seems more like play dates." The court terminated mother's parental rights, as well as those of

14

L.S. and A.P., and ordered adoption with Ms. Z. as daughter's permanent plan.

**6.     Facts Relevant to ICWA/Cal-ICWA**

    **a.     Mother**

Initially, mother reported her family might have Cherokee Indian ancestry.  However, mother had no tribal registration number, and no relatives with tribal affiliation were found prior to daughter's initial placement.  Soon after, mother filed an ICWA-020 form stating she had no known Indian ancestry. Mother again denied Indian ancestry prior to the adjudication hearing.

During a July 2022 hearing, maternal grandmother told the court she believed she had Native American ancestry because her "daughter recently got a blood test" that "shows [they] have Native American ancestry."  Maternal grandmother stated she "was going to do the test" but she had not yet done so.  The court ordered the Department to ask "maternal grandmother and any known relatives regarding ICWA, if it hasn't already done so."

    **b.     Alleged and Presumed Fathers**

L.S. twice denied having Indian ancestry.  N.A. also denied Indian ancestry, and the court found there was no reason to believe ICWA applied to him.  A.P. reported "there is no known history of ICWA in his family."  He refused to provide names of his relatives.  The juvenile court held ICWA did not apply to A.P.

**7.     Appeal**

Mother appealed.  In her notice of appeal, mother stated she was appealing from "1/9/2024 Denial of Continuance; Denial of Setting 388 for Hearing; Termination of Parental Rights."

## DISCUSSION

**1.    Section 388 Petition**

Mother argues the juvenile court erred when it summarily denied her section 388 petition without a hearing.  Mother claims she made a prima facie showing of both changed circumstances and that the requested modification would be in daughter's best interest.  As discussed below, we find no error.

**a.    Applicable Law**

A parent of a dependent child may seek modification of an order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).)  "[T]he parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests."  (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.)

The juvenile court is not required to hold a full hearing on a section 388 petition.  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation.]'  [Citations.]  There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.  [Citation.]  If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing."  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' "

16

(*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Thus, "after reunification services have terminated, a parent's [section 388] petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

> **b.     Standard of Review**

"We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250.)  " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)  A court exceeds the limits of discretion if its determination is arbitrary, capricious, or patently absurd.  (*Id.* at p. 318.)

> **c.     Analysis**

We agree with the Department that mother failed to demonstrate changed circumstances.  In her section 388 petition, mother pointed to her enrollment in a treatment program "to complete the remaining components of my case plan as well as to make up for my missed testing" as her changed circumstance.  Mother attached to her section 388 petition a November 2023 letter from the treatment center stating that, the month before, she had enrolled in either a "Day Treatment," "Outpatient" or "Residential" substance abuse program (the letter does not specify which).  The letter also states mother would attend "treatment" and "12-Step Program meetings."  The letter does not mention drug testing or whether mother had completed any drug

17

tests since enrolling in the program, let alone whether or how she had benefited from the program or participated in counseling, which also was part of her case plan.  The letter was not, as mother describes it on appeal, a "progress letter."  On this record, at best, mother presented changing circumstances, which was not enough.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.)

Mother also failed to demonstrate that the requested change of order (i.e., reinstatement of reunification services) was in daughter's best interest.  In her section 388 request, in response to why her requested change would "be better for the child," mother stated simply, "I visit consistently and have a bond with my daughter."  Although the record supports a finding that mother loved daughter and the two shared a bond, the record also reveals both that daughter's behavior regressed during and after visits with mother and daughter's therapist did not believe visits with mother were "healthy" for daughter.  On appeal, mother posits daughter's regressions could be because daughter missed mother while they were apart or because daughter was still adjusting to her new placement with Ms. Z. after years of living with Mr. and Mrs. M.  On appeal, however, we cannot reweigh the evidence or substitute one inference for another.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)  On the eve of the permanency planning hearing (which had been continued multiple times over the course of close to two years), mother failed to show how her proposed change of order would promote daughter's stability.  (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)

18

The juvenile court did not abuse its discretion in summarily denying mother's section 388 petition.

## 2. Relative Placement

Mother argues the juvenile court erred by not ordering an assessment of maternal grandmother as a relative placement for daughter.  Mother seeks reversal of the order terminating parental rights and remand for a relative placement hearing.

### a. Jurisdiction

As an initial matter, we address the Department's two-pronged argument that we lack jurisdiction to consider the relative placement issue.  First, the Department argues mother did not appeal or otherwise challenge the juvenile court's earlier orders denying assessment for relative placement such that those orders are now final.  Second, the Department argues mother failed to specify in her notice of appeal the court's most recent order (made at the January 9, 2024 hearing) denying her request for relative placement.

Although we agree with the Department's first argument, we disagree with the second.  Because mother did not appeal or otherwise challenge the juvenile court's earlier orders denying her requests for relative placement, those orders are final and mother cannot now challenge them on appeal.  (§ 395, subd. (a)(1).)  The Department's second point hinges on the fact that, of the three orders specified in mother's notice of appeal, none was the court's order denying her request for relative placement.  We do not read the notice of appeal so narrowly.  Indeed, as the Department recognizes, we must construe the notice of appeal liberally.  (Cal. Rules of Court, rule 8.100(a)(2).)  Here, the notice of appeal specified the following three orders made at the January 9, 2024 hearing:  the denial of a

19

continuance, the denial of mother's section 388 petition, and the termination of parental rights.  Although the notice of appeal did not specify the court's January 9, 2024 order denying mother's request for relative placement, we conclude her appeal encompasses that order, which was made at the same hearing as the other identified orders.  On appeal, mother contends the issue of relative placement might impact the issue of termination of parental rights, which clearly is a part of her appeal.[2]  In this sense, we conclude mother preserved the issue of relative placement for appeal.

### b.    Standing

The Department also argues mother lacks standing to raise the issue of relative placement on appeal.  On this point, we agree.

"Not every party has standing to appeal every appealable order.  Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal.  [Citations.]  An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236.)  "[A] parent does not have standing to raise relative placement issues on appeal, where the parent's reunification services have been terminated.  [Citation.]  This is because decisions concerning placement of the child do not affect the parent's interest in reunification, where the parent is no longer able to reunify with the child." (*In re A.K.* (2017) 12

---

[2] In the following section, we address the tenuous connection between the relative placement issue and termination of parental rights as presented in this case.

20

Cal.App.5th 492, 499.)  Nonetheless, our Supreme Court has held "[a] parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights."  (*In re K.C.*, *supra*, 52 Cal.4th at p. 238.)

Mother recognizes the general rule that, once her reunification services were terminated in January 2022, she lacked standing to raise the relative placement issue on appeal. Nevertheless, mother argues she has standing to raise the issue in this appeal because (i) she asked multiple times below to have maternal grandmother assessed for placement, (ii) she filed a section 388 petition seeking to reinstate reunification services, and (iii) placing daughter with maternal grandmother might have impacted whether mother's parental rights were terminated and would have "furthered Mother's bond and relationship with [daughter] as maternal grandmother had been monitoring Mother's visits in her home without incident."

We are not persuaded by mother's arguments.  First, as noted above, other than her request made at the January 9, 2024 hearing, mother failed to appeal or otherwise challenge the denials of her relative placement requests.  Accordingly, those rulings are not before us.  Second, also as discussed above, we find no error in the juvenile court's order denying mother's section 388 petition.  Finally, it is entirely and inappropriately speculative to consider whether placement with maternal grandmother might have impacted the court's ruling on mother's parental rights.  At best, and as mother recognizes, if we were to reverse on the relative placement issue, the juvenile court would hold a relative placement hearing under section 361.3.  That

21

alone would not affect mother's parental rights. Rather, mother's parental rights might be protected if, for example, maternal grandmother wanted daughter to be placed with her, the juvenile court believed it was in daughter's best interest to have maternal grandmother and her home assessed for placement, it was determined maternal grandmother and her home were safe and appropriate for daughter, daughter successfully lived with maternal grandmother for some time, maternal grandmother was unable or did not want to adopt daughter but instead opted for legal guardianship, and the juvenile court determined legal guardianship with maternal grandmother was in daughter's best interests. (See §§ 361.3, 366.26, subd. (c)(1)(A).) Such speculation does not give rise to standing. (*In re Cody R.* (2018) 30 Cal.App.5th 381, 390; *In re K.C.*, *supra*, 52 Cal.4th at p. 236.)

## 3. Beneficial Parental Relationship

Mother also argues the order terminating parental rights must be reversed because the juvenile court erred when it failed to apply the beneficial parental relationship exception to adoption. We disagree.

### a. Applicable Law

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies. (§ 366.26, subds. (b) & (c)(1).) Here, it is undisputed daughter was likely to be adopted. Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.

The exception mother raises is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides: "[T]he court shall

22

terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

To establish this exception, the parent must prove the following three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631 (*Caden C.*).)  "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

b.    **Standard of Review**

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review.  On the one hand, "[a] substantial evidence standard of review applies to the

23

first two elements [of the exception].  The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination.  It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion.  As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.]  But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the

reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### c.     No Error

We assume mother satisfied both the first element (regular visitation and contact with daughter) and the second element (a relationship with daughter, the continuation of which would benefit her) of the beneficial parental relationship exception. We conclude, however, the juvenile court did not abuse its discretion in determining mother failed to establish the third element.

As noted above, the third element requires the juvenile court to "decide whether it would be harmful to the child to sever the [parental] relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Although the loss of a parental relationship, including the one in this case, may cause detriment to a child, the question for the juvenile court is whether the countervailing positives the child gains in a permanent, stable home outweigh any such detriment. (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the

25

child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

Here, it was not an abuse of discretion to determine adoption by Ms. Z. outweighed any detriment daughter might experience by losing her relationship with mother. Although daughter certainly enjoyed her time with mother, it was reasonable to conclude maintaining their relationship did not outweigh " 'the security and the sense of belonging a new family would confer.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) For most of her young life, daughter has not lived with mother and her visits with mother were always monitored. Moreover, daughter's therapist believed visits with mother were not "healthy" for daughter. The therapist did not believe daughter had a connection with mother, noting daughter was unable to talk about her visits other than to say what food she ate. The therapist, Mr. and Mrs. M., as well as Ms. Z., all observed daughter to regress markedly after visits with mother. Similarly, a Department social worker observed daughter's behavior to regress during a visit. Although mother attributes daughter's regression to her change of placement from Mr. and Mrs. M. to Ms. Z., daughter was observed to regress after visits with mother long before she was placed with Ms. Z. Moreover, our role is not to reweigh the evidence or substitute our inferences for those of the trial court. (*Caden C.*, *supra*, 11 Cal.5th at pp. 640, 641.)

On the other hand, daughter had bonded quickly with Ms. Z., calling her "mommy," stating she wanted to stay with Ms. Z. "until she is a big person," and telling Ms. Z. she loved her. Daughter was making measurable progress under her care. Ms. Z. was able to offer daughter—a child with special needs—a loving, safe, and stable home. On this record, we conclude the

juvenile court did not abuse its discretion when it refused to apply the beneficial parental relationship exception here.

### 4. ICWA/Cal-ICWA

#### a. Applicable Law

"ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes and does not prohibit states from establishing higher standards." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1129.) Under Cal-ICWA, the juvenile court and the Department "have an affirmative and continuing duty to inquire whether" a dependent child "is or may be an Indian child." (§ 224.2, subd. (a); *Dezi C.*, *supra*, 16 Cal.5th at pp. 1131–1132.) For these purposes, an "Indian child" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal law definition].)

Under Cal-ICWA, the Department and the juvenile court have an initial "duty to inquire whether [a] child is an Indian child." (§ 224.2, subd. (b); *id.*, subd. (a).) The Department discharges this duty chiefly by "asking" family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b).) This includes inquiring of not only the child's parents, but also others, including but not limited to "extended family members." (*Ibid.*) "Extended family members" include the dependent child's adult "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c) [adopting federal law definition].) For its part, the juvenile court discharges this duty "[a]t the first appearance in

27

court of each party" by asking "each participant present" "whether the participant knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).) This duty is often referred to as the "initial duty of inquiry." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132.)

The second duty is the duty of the Department or the juvenile court to "make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).) This duty of further inquiry is triggered if the Department or court "has reason to believe that an Indian child is involved" because the record contains "information suggesting" the child is an Indian child, and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact the relevant Indian tribe(s). (*Ibid.*) "Reason to believe" is defined as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

The third duty is the duty to notify the relevant Indian tribe(s). (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).) This duty is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is involved." (§ 224.3, subd. (a).)

Recently, in *Dezi C.*, *supra*, 16 Cal.5th at page 1128, our Supreme Court addressed "whether a child welfare agency's failure to make a proper inquiry under California's heightened ICWA requirements constitutes reversible error." The *Dezi C.* court held, "[E]rror resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of

28

[Welfare and Institutions Code] section 224.2, document its inquiry in compliance with [California Rules of Court,] rule 5.481(a)(5), and when necessary, comply with the notice provision of [Welfare and Institutions Code] section 224.3." (*Dezi C.,* at p. 1136.)

### b.    Analysis

Mother makes two ICWA-related arguments.  First, mother argues she is entitled to reversal because the juvenile court and the Department failed to comply with Cal-ICWA inquiry as to her side of the family.  Specifically, mother notes the Department did not ask a maternal aunt about possible Indian ancestry.  The Department counters any alleged insufficiencies were not prejudicial and, therefore, not grounds for reversal.

On this point, we must agree with mother.  Although the Department asked mother and maternal grandmother about possible Indian heritage, there is no indication the Department contacted or tried to contact other available maternal relatives (including a maternal aunt who acted as a monitor for visits) to ask the same.  As such, this case falls within our Supreme Court's recent *Dezi C.* opinion.  Thus, given the inquiry error here (i.e., failure to ask available maternal relatives about possible Indian ancestry), we must conditionally reverse and remand to the juvenile court so that the court and the Department can satisfy their duties under ICWA/Cal-ICWA. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1136.)

Second, mother argues because maternal grandmother stated one of her daughters (it is not known which one) "recently got a blood test" that "shows [they] have Native American ancestry," the Department was required to make "further inquiry" under Cal-ICWA.  On this point, we do not agree with

29

mother.  Both mother and the Department cite *In re J.S.* (2021) 62 Cal.App.5th 678.  In that case, our colleagues in Division Seven explained why a DNA test done through ancestry.com had "little usefulness" when determining whether a dependent child is an Indian child for purposes of ICWA.  The court noted, not only do such tests often return very generalized, unhelpful results, but " '[b]eing an "Indian child" is . . . not necessarily determined by the child's race, ancestry, or "blood quantum," but depends rather "on the child's political affiliation with a federally recognized Indian Tribe." ' "  (*Id.* at p. 689.)  "In other words, an Indian child is one with a tribal affiliation, not merely Indian ancestry."  (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1009, disagreed with on other grounds in *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18.)

Although we do not know what type of blood test maternal grandmother meant when she said her daughter "got a blood test," the principles discussed in *In re J.S.*, *supra*, 62 Cal.App.5th at pages 689–690, apply here.  Maternal grandmother's vague reference to a "blood test" that "show[ed]" Indian ancestry is insufficient to trigger the further inquiry requirement.  Maternal grandmother's statement simply gave no "reason to believe" daughter was an Indian child for purposes of ICWA and Cal-ICWA.  (See § 224.2, subd. (e)(1) [defining "reason to believe" as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe"].)  Although certainly on remand, the Department should follow up on maternal grandmother's statement about her daughter's blood test, we conclude that statement did not trigger the duty of further inquiry under Cal-ICWA.

## DISPOSITION

The juvenile court's January 9, 2024 order is conditionally reversed. The matter is remanded to the juvenile court for compliance with the inquiry and notice requirements of Welfare and Institutions Code section 224.2 and 224.3 and the documentation provisions of California Rules of Court, rule 5.481(a)(5). Specifically, the court shall ensure that the Department asks available maternal relatives as to daughter's potential Indian ancestry. If the juvenile court thereafter finds a proper and adequate inquiry and due diligence has been done and determines ICWA does not apply, then the court shall reinstate its order terminating parental rights. If the court concludes ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions.

In all other respects, the court's January 9, 2024 order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

31